## UNITED STATES v. THE TIMES-PICAYUNE PUB. CO. et al.

### Civ. A. No. 2797.

United States District Court
E. D. Louisiana, New Orleans Division.

May 27, 1952.

J. Horace Flurry, George E. Leonard, Baddia J. Rashid, Fred D. Turnage, Trial Attys., Washington, D. C., H. G. Morison, Asst. Atty. Gen., Victor H. Kramer, Trial Atty., Washington, D. C., John N. McKay, U. S. Atty., New Orleans, La., for plaintiff.

Charles E. Dunbar, Jr., Ashton Phelps, New Orleans, La., Henry N. Ess, James C. Wilson, Kansas City, Mo., for defendants.

CHRISTENBERRY, Chief Judge.

This is an action filed by the United States under Section 4 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 4, against The Times-Picayune Publishing Company, a Louisiana Corporation, which publishes the Times-Picayune (morning), the New Orleans States (evening), and the Times-Picayune and States (Sunday), L. J. Nicholson, its President, John F. Tims, its Vice-President and General Manager, Aubrey F. Murray, its Advertising Director, and Donald W. Coleman, its Circulating Manager.

The complaint alleges that (a) the defendant corporation has entered into and

is a party to contracts with advertisers in unreasonable restraint of trade in newspapers, news, advertising, supplies, and nationally advertised products, in violation of Section 1 of the Act; (b) all of the defendants are combining and conspiring in unreasonable restraint of the aforesaid trade also in violation of Section 1 of the Act; and (c) all of the defendants are combining and conspiring to monopolize, and are attempting to monopolize, the dissemination of news and advertising through newspaper channels, in violation of Section 2 of the Act.

The complaint seeks equitable relief to prevent the defendants from continuing to utilize the allegedly unlawful advertising contracts, and from engaging in other practices alleged to be restraining the trade of their only newspaper competitor in New Orleans, and preventing advertisers from freely selecting a medium for their evening newspaper advertising in New Orleans.

The answer of the defendants admitted some of the allegations of fact, but denied that any violations of law had been committed.

██ Although the Government undertook to support all of the charges, in its brief filed at the close of the trial the Government urged only the charges that the defendants have contracted in restraint of trade, and have attempted to monopolize trade in violation of Sections 1 and 2 of the Sherman Act. The allegations that defendants conspired among themselves in violation of Sections 1 and 2 of the Act were not urged, and must be considered as having been abandoned.

The Times-Picayune Publishing Company has published in New Orleans continuously since prior to 1933, a morning and Sunday newspaper (known in the morning as the Times-Picayune, and on Sunday since 1933 as the Times-Picayune-States), which is in general circulation in the city of New Orleans and elsewhere in the State of Louisiana, and in other states of the United States.

During the period from July, 1941, until March, 1950, the Company published and distributed and sold the only Sunday newspaper published in New Orleans.

The States was formerly published as an evening newspaper by the Daily States Publishing Company, Ltd. On July 17, 1933, The Times-Picayune Publishing Company purchased from the Daily States Publishing Company, Ltd., the name, good will, and circulation of the newspaper known as the New Orleans States, its contracts with advertisers, and also its contracts and rights to be furnished news, features and comics. The contract of purchase provided that the vendors would not engage in the newspaper publishing business in the New Orleans area for a period of ten years thereafter; that the vendors would not for a period of nine months thereafter sell any part of their machinery or equipment to any purchaser located in the New Orleans area, and that in any sale of any part of the machinery or equipment to any person, there should be included an agreement on the part of said purchaser that the machinery or equipment would not be used by it or its assigns in the New Orleans area within nine months from the date of the contract; and that the vendors for a period of nine months would not sell any part of the machinery or equipment without first offering it to the defendant corporation. Since said purchase, the Company has published the States as an evening newspaper of general circulation in New Orleans and elsewhere in the State of Louisiana, and in other states of the United States.

The New Orleans Item is a newspaper of general circulation published in the evening, Monday through Friday, with a Sunday edition which comes out on Saturday. The New Orleans Item competes with the newspapers published by The Times-Picayune Publishing Company. It is published in New Orleans, and has a circulation in New Orleans and elsewhere in the State of Louisiana and in other states of the United States.

The Times-Picayune, States and Item are the only significant media of news, advertising and other information disseminated regularly for residents of New Orleans through publication and circulation of newspapers.

### The Times-Picayune and the States are Separate Newspapers

The defendants asserted in their answer, and contended throughout the trial, that the Times-Picayune, the States, and the Times-Picayune-States are editions of a single newspaper published by The Times-Picayune Publishing Company. However, the evidence establishes beyond question that the defendant corporation publishes two separate and distinct newspapers, consisting of the Times-Picayune, morning and Sunday, the Sunday edition being called "The Times-Picayune-States", and the States, evening. These newspapers are separate and distinct and have always been considered so by defendants. They reach separate groups of readers; are produced at least in part by separate organizations; and have separate news and feature content. Although the editorial policy is identical, the editorial content is different. The two newspapers have an entirely different and distinctive make-up and appearance.

On three occasions in 1949 the manager of general advertising for the Company, Mr. Roland Ladreyt, wrote to national advertisers stating that "entirely separate organizations" "produced" the Times-Picayune and the States. In two of these letters he pointed out that the Times-Picayune and the States each has its own complete staff, including editor, managing editor, city editor, reporters, and photographers; that there is actually competition in the respective departments for "breaking first with outstanding events"; that the circulation departments are on a competitive basis; and that the retail advertising staffs are separate. He stated further the make-up of the States and the Times-Picayune is as different as the New York Times and the New York Journal American, and also that more than 35,000 families in New Orleans subscribed to the New Orleans States which did not have the Times-Picayune week-day delivered to their homes. All of the representations made by the manager of general advertising in these letters are borne out by the evidence, including the testimony of the defendant Tims, and that of Mr. George Healy, Vice-President of the defendant corporation, and Managing Editor of the Times-Picayune.

The Times-Picayune and States contain different features, syndicated columns, editorial cartoons, comics, and news. Separate contracts with the Associated Press and feature syndicates were signed by the defendant corporation for the Times-Picayune, and for the States. In each of those contracts which concerned the States that publication was referred to as "a newspaper".

The audits of the Company's books and records for the years 1947 to 1949, prepared by Haskins and Sells, Certified Public Accountants, show an allocation of revenues and expenses as between the Times-Picayune and the States, and these allocations were accepted by the accounting firm as they appeared on the books and records of the Company.

The statements rendered by the Company for advertising and the letterheads of the Company refer to the Times-Picayune as being issued "every morning and Sunday", and the States as being "issued every evening except Sunday".

The defendant corporation, over the notarized signatures of defendants Tims and Coleman, submits to the Audit Bureau of Circulation separate statements for the Times-Picayune, morning and Sunday, and the States, evening.

In testifying before the War Production Board in 1944, the defendant Tims stated that when the Company bought the New Orleans States in 1933, it elected to keep it as a separate newspaper.

In the Times-Picayune of January 25, 1937, there appeared an historical account of the defendant corporation's operations, and in referring to the States the account stated:

"In 1933 the Times-Picayune Publishing Company bought the New Orleans States. The Sunday States was merged with the Times-Picayune. The week-day States continued its separate existence."

In an announcement in the Times-Picayune of July 18, 1933, the former owner of

the States stated, "Under the terms of the sale, the New Orleans States will continue to be published as a six-day newspaper in the afternoon field."

### The Times-Picayune's Dominance in New Orleans and in the New Orleans Trading Territory

That the Times-Picayune is the dominant newspaper of New Orleans and its trading territory, there can be no doubt. It is the only morning newspaper of general daily circulation published in New Orleans, and there are no other daily morning newspapers circulated in New Orleans which compete with it for local and national advertising in the morning field. In each of the years 1949 and 1950 its circulation was equal to the combined circulation of both the States and the Item. For at least twenty years the Times-Picayune has been the largest newspaper in New Orleans in circulation, advertising lineage, and number of pages published.

The Company has asserted, quite justifiably, that "The Times-Picayune is the dominant newspaper of New Orleans and its trading territory".

The Manager of General Advertising for the defendant corporation, in 1949, wrote that the Times-Picayune is "the back-bone of any advertising effort" in the New Orleans market. That statement is doubtless true.

Enjoying as it does a monopoly position in the morning field, and an enormous advantage in circulation, advertising lineage and number of printed pages, newspaper advertisers who desire to cover the New Orleans market must, of necessity, use the Times-Picayune as a medium for their advertising.

### Defendant's Advertising Contracts

Advertising in New Orleans newspapers is commonly divided into three principal categories, namely: classified, general, sometimes called national, and local display, sometimes called retail.

### Classified Advertising

The defendant corporation at all times since March, 1935, has required advertisers using classified advertisements to agree to purchase, and to purchase, such advertisements in the Times-Picayune and the States, as a unit, at combination rates, and has refused to sell such advertising in the morning or evening newspapers separately, except for what is known as "over the river" classified advertising. The "over the river" classified advertising represents such a very small part of the total classified as to be relatively unimportant.

There seems to be no doubt but that the purpose of the unit rate on classified advertising is to increase the lineage of such advertising in the States, and certainly that has been its effect. In 1934, that is to say one year prior to the adoption of the unit rate on classified advertising, and while the States was under the ownership of the defendant corporation, the States carried less than one-half the number of lines of such advertising carried by the Times-Picayune. By 1936, after one year of the unit rule, the classified lineage of the States had risen to a par with that of the Times-Picayune. This was inevitable, since in order to obtain lineage in the Times-Picayune it was necessary for a classified advertiser to take a similar amount of lineage in the States. During the ensuing fifteen years, up to and including 1950, the spread between the lineage in each of the two newspapers, and that of the Item, steadily increased. As a matter of fact, during the years 1946 through 1950, because of the "over-the-river" classified advertising, which advertising was carried only by the States, the States carried more classified advertising lineage than did the Times-Picayune.

In 1950, classified advertising lineage carried by the Times-Picayune and by the States approximated four and one-half million lines each, or more than double the lines carried by the Item. In 1934 the States carried 35% of the classified advertising lineage in the evening field. By 1950 it carried 68% of such lineage. It is only reasonable to attribute at least a major portion of this increase to the compulsory rate.

A number of classified advertisers testified that the Times-Picayune is their first selection as an advertising medium in New

Orleans. Four of them testified that the Item is their second choice. Three such advertisers testified that budget limitations require them to place only a limited amount of advertising in newspapers in New Orleans. Two testified that they would place advertising lineage in the Item if the unit rule were not in effect. There was evidence that at least three advertisers increased their advertising lineage in the States, or added the States to their schedule involuntarily, as a result of the unit rule. The unit rule is not followed with respect to local display advertisers, and the explanation was made by the Manager of General Advertising of the Company, that it would be an imposition on retail advertisers to have a unit rate for them, "because the retail advertisers gear their advertising to produce immediate over-the-counter results, and an advertiser * * * may be sold out by 11 o'clock in the morning". It is proper to mention here that many retailers use classified advertising, and why it would be an imposition to exact a unit rate for local display advertising, and is not for classified, was not explained. It seems clear beyond question that many classified advertisers are required to purchase what they do not want, namely, space in the States.

### General Advertising

From 1933 to 1940, general advertisers were afforded an opportunity to purchase advertising space in the Times-Picayune and the States separately, but were given the benefit of an optional combination rate for advertisements carried in both papers, the combination rate being lower than the sum of the individual rates for each newspaper.

The unit rate for national advertising was first adopted by the defendant corporation on June 1, 1940. It was optional and continued in effect, with some changes in details, for ten years. Under this arrangement, the Company required advertisers, in order to obtain a reduced rate on general advertising in excess of 10,000 lines in its daily papers, to contract to purchase, and to purchase, such advertisements in excess of 10,000 lines in a combination of the Times-Picayune and the States.

The defendant corporation issued a new general rate card effective February 1, 1950, requiring general advertisers to contract to purchase general advertising in the Times-Picayune (daily only), and in the States (daily only), as a unit at combination rates, and refusing to sell such advertising in each newspaper separately.

At that time, profits in the Times-Picayune, before general and administrative expenses, were increasing while those in the States were decreasing.

The purpose of the defendants in adopting the unit rate on all general advertising is illustrated by a memorandum prepared by the national advertising representative of the defendant corporation, V. J. Kelley, and sent by him to his various branch offices. This memorandum was written on November 26, 1949, after Kelley had attended conferences with representatives of the defendant corporation, including defendants Nicholson and Tims, at which the adoption of the unit rate was agreed upon. Copies of the memorandum were sent to Mr. Tims and to Mr. Ladreyt. In his memorandum, after stressing the favorable position occupied by the Times-Picayune and the States, with respect to circulation coverage of the New Orleans market, Mr. Kelley stated:

"We anticipate that a relatively few accounts which have formerly used the Times-Picayune exclusively or the other evening paper in conjunction, may endeavor to prevent the 'old order changeth'. In those cases be firm. The policy has been set. * * *",

and further:

"Last, but not least, this single unit plan ought to eliminate to a great extent the deleterious selling on the part of our evening contemporary, which, in the long run, is not to the best interests of the manufacturer."

During his testimony, in reply to a question, Mr. Kelley stated that it was true in a number of cases that the advertising agencies favored the compulsory or unit rate, because once an agency had made its selection or its recommendation of media to the advertiser, the agency could resist any pressure brought to make a

change in media by pointing to the unit rate as making such change impossible.

The unit rate on general advertising resulted in an increase of more than 30% in 1950 over 1949 in such lineage in the States. Some accounts which had used the Times-Picayune exclusively, or some other paper in conjunction therewith, objected to the imposition of the forced combination. Seventeen national advertisers or advertising agents testified at the trial concerning the effect on their advertising of the unit rate. National advertising expenditures are budgeted, and only a limited amount is placed in newspapers in any one city. A great number of advertisers use only one morning and one afternoon newspaper, and some advertisers completely abandoned use of the daily Item, while others reduced their lineage in that newspaper, as a result of the forced unit rate on general advertising. Some advertisers increased their general advertising lineage in the States, or added the States to their schedule involuntarily as a result of the unit rate.

During the four years preceding the introduction of the unit rate the Times-Picayune carried in excess of 50% more general display advertising than the States or the Item. Following the establishment of the forced unit rate, general display lineage carried by the States rose sharply. Within several months, after unexpired contracts had been completed, the lineage of the States equalled that of the Times-Picayune. In the meantime, such lineage in the Item showed a slight gain. It is impossible, of course, to state with any degree of precision what portion of the increased lineage enjoyed by the States would have gone to the Item but for the forced unit rate. However, it is clear that some general advertisers bought space in the States which they would not have purchased in either afternoon paper, while others bought space in the States which they would have purchased in the Item absent the forced unit rate. It is clear, too, that the States secured a commanding lead over the Item in the general display field after it had the advantage of the unit rate, and not until then.

## Local Display Advertising

Since 1935, the defendant corporation in connection with contracts for display advertising has provided that any advertiser contracting for lineage in the Times-Picayune would be billed for any advertising in the States during the period of the contract, at the States rates, but based upon the lineage contracted for in the Times-Picayune. From 1938 to 1946 the defendant corporation offered retail advertisers a reduction of one cent a line on all advertising carried in both the Times-Picayune and the States, provided the identical copy was placed in each newspaper. In 1946, the one cent reduction was abandoned, but the offer of a reduced rate to States advertisers, based upon the amount of lineage contracted for in the Times-Picayune, was continued. The effect of these inducements doubtless was to draw some advertising from the Item to the States.

## News Vendors

 The Item Company, in November 1949, announced plans to begin again publication of a Sunday newspaper, its Sunday edition having been suspended in 1941. Publishing, as they did at that time, the only Sunday newspaper in New Orleans, it goes without saying that this announcement caused concern to the defendants. It is in evidence that defendant corporation's Manager of General Advertising wrote a letter in January, 1950, in which he stated:

"In our opinion, there is no necessity for another Sunday paper in New Orleans, and the plan of the Item to enter the Sunday field beginning March 5th is not economic from the standpoint of the reader and the advertiser, and we consider their doing so an infringement on a franchise which we believe belongs to us."

The Government contended that defendants sought to hinder the Item in distributing its Sunday newspapers by warning the defendant corporation's news vendors that if they handled the Sunday Item they would not be permitted to handle the evening States. Defendants, on the other hand, asserted that certain vendors who

sold both the States and the Item had not been according the former fair and equal treatment in sales and distribution, and that such vendors had been given the alternatives of according both newspapers the same treatment or ceasing the sale of one or the other. I think the evidence bears out defendants. The so-called Sunday edition of the Item can scarcely be termed a Sunday newspaper. It is true that it contains comics and feature sections which do not appear in the week-day editions. The Item publishes no Saturday edition under that name, but the Sunday edition is printed from approximately 9 o'clock A. M. to 4 o'clock P. M. each Saturday, and bears the date-line of the succeeding Sunday. Only on rare occasions are special editions containing late Saturday afternoon news put out. Thus, the Item appears on the newsstands on Saturdays, along with the States, and is in competition with the States all day Saturday, until late afternoon or early evening, when the first edition of the Times-Picayune appears. The defendants were entirely within their rights in requiring a choice of the offered alternatives.

### The Contention of the Government That the Defendants Operated the Evening States at a Loss

█ Considerable evidence was offered by the Government in an effort to establish that the defendants maintained a rate structure which, considered as a whole, resulted in the operation of the evening States at a loss. The defendant corporation's net profit from its operations during 1948 and 1949 averaged more than $2,000,-000, but the Government contended that during this period and into 1950 the States was operating at a loss. The Company's records carried a break-down of revenues and expenses as between the Times-Picayune, morning and Sunday, as a unit, and the States as a unit. Allocations were made of revenues, advertising and circulation, as between the two papers. Allocations were also made of most of the expense items. The Government contended, however, that in certain departments expenses were only partially allocated, or not allocated at all. On the books of the corporation, the States showed substantial profits for the years 1947 through 1950. It is conceded by defendants that the defendant corporation solely for the convenience of its management made allocations as between the two newspapers on an arbitrary basis of "80–20", 80% of the expenses being allocated to the Times-Picayune, morning and Sunday, and 20% to the States, evening.

In reports to the management of the defendant corporation, its auditing firm, Haskins and Sells, referred to the method of allocating expenses followed by the defendant corporation, and suggested that if it were desired that the Company's records reflect separately the net income of the Times-Picayune and the New Orleans States, consideration be given by the management to the advisabliity of a study to determine the basis of proper allocation of all operating expenses. The resident partner of Haskins and Sells testified, however, that his firm had no reason to believe that any basis of allocation resulting from such a study would disclose that the States was operating at a loss.

The Government's chief complaint was that certain expense items were not allocated as between the defendant corporation's two newspapers, but were charged to the corporation generally. The evidence shows that not only did the corporation not allocate certain expenses but that in determining profits the Company did not allocate many items of general income, such as interest on investments, dividends on stock, profits from sale of capital assets, etc. The management was satisfied with the method of allocation employed, and was interested in the net result of the defendant corporation's operations. I find nothing in the evidence which would indicate, much less establish, that the States at any time was operated at a loss.

### Applicability of the Sherman Act

█ I am convinced that the defendants, except defendant Donald W. Coleman, who had no connection with the adoption or enforcement of the unit rule, have violated Section 1 of the Sherman Act. Publishing, as it does, two separate and

distinct newspapers, the defendant corporation's general and classified advertising contracts which compel an advertiser in one of its newspapers to contract for an equal amount of space in its other newspaper, effect tying-in sales. With respect to such sales, the Supreme Court in Standard Oil Company of California & Standard Stations v. United States, 1949, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371, said:

"Tying agreements serve hardly any purpose beyond the suppression of competition. * * * In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained could induce a buyer to enter one. See, Miller, Unfair Competition, 199 et seq. (1941); Note, 49 Col.L.Rev. 241, 246 (1949). The existence of market control of the tying device, therefore, affords a strong foundation for the presumption that it has been or probably will be used to limit competition in the tied product also".

The corporation is able to enforce the unit rate only because of the dominant position which the Times-Picayune, the tying product, occupies in New Orleans and in the New Orleans trading area. The Times-Picayune, because of its monopoly position, has been able to force buyers of advertising space to purchase what they do not want, space in the States, in order to obtain what they require, space in the Times-Picayune. The very fact that the defendant corporation was able successfully to impose the unit rate on general and classified advertising tends to prove the monopoly position which the Times-Picayune enjoys. In the case of United States v. Pullman Company, D.C., 50 F. Supp. 123, 132, in speaking of certain practices of the defendant, the court said:

"They do tend to show that a concern which is able to impose such conditions has a monopolistic control of its market and that whatever concession its customers obtain becomes a

matter of grace from the monopolist and not from the pressure of free competition."

It is doubtless true as defendants contended that one reason for the establishment of the unit rate was to increase the revenue of the defendant corporation. However, it is apparent from the record that it was also the intention of the defendants, except the defendant Coleman, to restrain general and classified advertisers from making untrammelled choice between the afternoon newspapers in purchasing advertising space, and also to substantially diminish the competitive vigor of the Item, the States' only competitor in the afternoon field. As one defendant put it, one purpose of the rate was to "attempt to slow the Item down."

Section 1 of the Sherman Act condemns contracts in restraint of trade, as well as combinations and conspiracies. Restraint of trade, as that term is used in Section 1 of the Act, includes restraint of competition. In Paramount Famous Lasky Corporation v. United States, 1930, 282 U.S. 30, 43, 51 S.Ct. 42, 45, 75 L.Ed. 145, the Court said:

"Congress has so legislated 'as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted.' Eastern States Lumber Assn. v. United States, supra [1912] 234 U.S. [600] page 613, 34 S.Ct. 951, 954 [58 L.Ed. 1490]."

Contracts or combinations which foreclose competitors from a substantial market or from a substantial part of a market restrain trade within the meaning of the Sherman Act. The Sherman Act condemns the foreclosure of competitors. In United States v. General Motors Corporation, 7 Cir., 1941, 121 F.2d 376, 403, certiorari denied, 1941, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, the court said:

"* * *, the theory in back of the Sherman law is to protect the free movement of goods in interstate commerce against unreasonable restraints, to assure open interstate markets

where traders may freely negotiate sales, and to preserve the normal competitive forces which otherwise might operate in these markets."

The defendants contended that the establishment of the unit rate on classified and general advertising was a customary and legitimate method of increasing the defendant corporation's revenue. They contended that any restraint which may have resulted was that which normally and inevitably occurs whenever one competitor takes business from another, and that consequently the restraint, if any, was not unreasonable within the intendment of the statute.

With respect to ascertaining the standard by which it is to be determined what restraints are reasonable and what are unreasonable, the Court in United States v. Trenton Potteries, 1927, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700, said:

"Reasonableness is not a concept of definite and unchanging content. Its meaning necessarily varies in the different fields of the law, because it is used as a convenient summary of the dominant considerations which control in the application of legal doctrines. Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least, in the light of its effect on competition, for, whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition."

Thus it will be seen that the effect of the restraint on competition is the important question in determining reasonableness. For the restraint to be unreasonable it is not necessary that it eliminate all or substantially all competition. If this were not true, only total monopolization would be unlawful under the Act.

The evidence discloses that a substantial portion of the market is restrained by the unit rule. It was shown that defendant corporation's general advertising contracts affect 58% of all general advertisers in the New Orleans market. This includes those general advertisers who in 1949 used the morning and one of the two evening newspapers (33.4%), the Times-Picayune (22.7%), and the States only (2%). Breaking the figures down further, it is found that 23.7% used the Times-Picayune and the States in 1949. Although these advertisers selected the Times-Picayune and the States voluntarily before the adoption of the unit rate, they should be included in ascertaining the effect of the rate, for the reason that although in the past they may have used both the Times-Picayune and the States, it does not necessarily follow that they will continue to prefer the States over the Item. But even disregarding this 23.7% of advertisers, there would still remain approximately 35% of all advertising accounts in 1949 in New Orleans newspapers which were affected by the adoption of the unit rate on general advertising. This can hardly be termed insubstantial.

I think it clear that the Supreme Court has not limited its condemnation of tying clauses to sales tying an unpatented to a patented product. In the Standard Oil Case, supra, [337 U.S. 293, 69 S.Ct. 1058] it will be noted that the court stated:

"* * * In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one." (Emphasis supplied.)

In the case of United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236, a case which did not involve patents or copyrights, the Court said:

"A man with a monopoly of theatres in any one town commands the entrance for all films into that area.

If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors."

It is thoroughly settled that the businesses of the defendant corporation and its competitor form a part of interstate commerce. In Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 185, the Court said:

"There can be little doubt today that the immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. Associated Press v. United States, 326 U.S. 1, 14, 65 S.Ct. 1416, 1421, 89 L.Ed. 2013; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S. Ct. 650, 81 L.Ed. 953. The same is true of national avertising originating throughout the nation and offering products for sale on a national scale. The local dissemination of such news and advertising requires continuous interstate transmission of materials and payments to say nothing of the interstate commerce involved in the sale and delivery of products sold. * * *"

### The Attempt to Monopolize

■ The Government contended that the defendants have used the dominant position of the Times-Picayune to exclude competition from a substantial part of the market involved in the publication and circulation of newspapers in New Orleans, and that defendants' attempt to monopolize has consisted of both the intent to exclude and the actual exclusion of their competitor, the Item, from a substantial part of this market.

The Government in this connection contended that the intent and the effect have been shown by (1) their purchase of the competing States in 1933; (2) their adoption of the unit rate for classified advertising in 1935; (3) their operation of the States, evening, at a loss since 1948, while making profits from the operations of the Times-Picayune, morning and Sunday;

(4) their adoption of the unit rate on general advertising; and (5) their interference with distribution of their remaining competitor's newspapers for 1949–50. I reject the Government's contentions with respect to the defendant corporation's purchase of the competing States in 1944; the alleged operation of the States, evening, at a loss since 1948, and the interference with distribution of defendants' competitor's newspapers in 1949 and 1950. No inferences that may reasonably be drawn from the evidence support those contentions. The Government has utterly failed to prove that the purchase of the States in 1933 was a part of a course of conduct which had as its purpose an attempt to monopolize. The sale of the States was broached by the Ewing family, its then owners. The terms of the sale, from which the Government seeks to have the Court draw inferences of unlawful intent, were legal and customary. It was only natural that defendants, intelligent and experienced business men that they are, would seek to protect themselves by conditions such as are found in their contract with the States' owners. Of course, legal means may sometimes be used to attain illegal ends, but that was not the case with respect to the purchase of the States.

The Government's contentions regarding the operation of the States at a loss, and the interference with the Item's news vendors have already been discussed, and no purpose will be served by repeating those discussions. It is sufficient here to say that the evidence convinces me that the States was not operated at a loss, and that the so-called interference with the Item's news vendors formed no part of an attempt by the defendants to monopolize.

I am satisfied that the evidence with respect to the exaction of the unit rate for classified advertising and general advertising, and the effects thereof, establishes a violation of Section 2 of the Act by all of the defendants except the defendant Donald W. Coleman.

In American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575, the Court approved a charge of the district court which stated:

"Now the term 'monopolize' in the phrase 'attempt to monopolize' means the employment of methods, means, and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approached so close as to create dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment",

and the Court stated:

"To support the verdicts it was not necessary to show power and intent to exclude all competitors, or to show a conspiracy to exclude all competitors. The requirement stated to the jury and contained in the statute was only that the offenders shall 'monopolize any part of the trade or commerce among the several States, or with foreign nations.' "

Defendants, other than Coleman, by the use of the unit rate device, attempted to monopolize that segment of the afternoon newspaper general and classified advertising field which was represented by those advertisers who also required morning newspaper space and who could not because of budgetary limitations or financial inability purchase space in both afternoon newspapers. This was clearly an attempt to monopolize a part of trade or commerce among the several states, within the meaning of the Statute.

In Lorain Journal Co. v. United States, supra, the Court said:

"To establish this violation of § 2 as charged, it was not necessary to show that success rewarded appellants' attempt to monopolize. The injunctive relief under § 4 sought to forestall that success. While appellants' attempt to monopolize did succeed insofar as it deprived WEOL of income, WEOL has not yet been eliminated. The injunction may save it. '(W)hen that intent (to monopolize) and the consequent dangerous probability exist, this statute (the Sherman Act), like many others, and like the com-

mon law in some cases, directs itself against that dangerous probability as well as against the completed result.' Swift & Co. v. United States, 196 U. S. 375, 396, 25 S.Ct. 276, 279, 49 L. Ed. 518. See also, American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Aluminum Co., 2 Cir., 148 F. 2d 416, 431."

And in the American Tobacco Company Case, supra, the Court said:

"In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific' intent, makes nonsense of it, for no monopolist monopolizes. unconscious of what he is doing. U. S. v. Aluminum Co. of America, 2 Cir., 148 F.2d [416] at page 432."

The Government is entitled to relief as against all of the defendants except Donald W. Coleman, and the suit will be dismissed as to him.

Findings of fact and conclusions of law will be submitted in accordance with Rule 2(d) of this Court; and the Government will submit a proposed form of decree.