## TIMES-PICAYUNE PUBLISHING CO. ET AL. *v.* UNITED STATES.

NO. 374.

Argued March 11, 1953.—Decided May 25, 1953.

*Ashton Phelps* argued the cause for appellants in No. 374 and appellees in No. 375. With him on the brief were *Charles E. Dunbar, Jr., Henry N. Ess* and *James C. Wilson.*

By special leave of Court, *John T. Cahill* argued the cause for the Birmingham News et al., as *amici curiae,* urging reversal. With him on the brief were *Thurlow M. Gordon, Neil C. Head, Wilson W. Wyatt* and *Hubert Hickam.*

*Acting Solicitor General Stern* argued the cause for the United States. With him on the brief were *Walter J. Cummings, Jr.,* then Solicitor General, *Acting Assistant Attorney General Hodges, Charles H. Weston, Victor H. Kramer* and *Baddia J. Rashid.*

By special leave of Court, *Edward O. Proctor* argued the cause and filed a brief for the Post Publishing Company of Boston, as *amicus curiae,* supporting the Government.

MR. JUSTICE CLARK delivered the opinion of the Court.

At issue is the legality under the Sherman Act of the Times-Picayune Publishing Company's contracts for the sale of newspaper classified and general display advertising space. The Company in New Orleans owns and publishes the morning Times-Picayune and the evening States. Buyers of space for general display and classified

advertising in its publications may purchase only combined insertions appearing in both the morning and evening papers, and not in either separately.[1]  The United States filed a civil suit under the Sherman Act, challenging these "unit" or "forced combination" contracts as unreasonable restraints of interstate trade, banned by § 1, and as tools in an attempt to monopolize a segment of interstate commerce, in violation of § 2.[2]  After intensive trial of the facts, the District Court found violations of

[1] On Sundays the Times-Picayune Publishing Company also distributes the Times-Picayune-States.  Under the existing unit plan, general display advertisers alternatively may insert in a combination of either daily paper with the Sunday paper.  Additionally, the Company's unit plan for classified advertising excludes some advertising, known as "over-the-river" classified, placed from a small local area. As neither the parties nor the District Court attached any significance to these exceptions to the challenged unit rates for general display and classified advertising space in the Publishing Company's daily papers, we mention them solely for completeness.

[2] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . . ." 15 U. S. C. § 1.

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, . . . ." 15 U. S. C. § 2.

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of [this Act]; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. . . ."   15 U. S. C. § 4.

The complaint named as defendants the Times-Picayune Publishing Company and four of its officers.  Two of these individuals remain as parties in these appeals, one died after the appeals were filed, and the District Court dismissed the complaint as to another. For convenience we refer to the former parties defendant as the "Times-Picayune Publishing Company" or "Publishing Company."

both sections of the law and entered a decree enjoining the Publishing Company's use of these unit contracts and related arrangements for the marketing of advertising space.[3] In No. 374, the Publishing Company appeals the merits of the District Court's holding under the Sherman Act; the Government, in No. 375, seeks relief broader than the District Court's decree. Both appeals come directly here under the Expediting Act.[4]

Testimony in a voluminous record retraces a history of over twenty-five years.[5] Prior to 1933, four daily newspapers served New Orleans. The Item Company, Ltd., published the Morning Tribune and the evening Item. The morning Times-Picayune was published by its present owners, and the Daily States Publishing Company, Ltd., an independent organization, distributed the evening States. In 1933, the Times-Picayune Publishing Company purchased the name, good will, circulation, and advertising contracts of the States, and continued to publish it evenings. The Morning Tribune of the Item Co., Ltd., suspended publication in 1941. Today the Times-Picayune, Item, and States remain the sole significant newspaper media for the dissemination of news and advertising to the residents of New Orleans.

The Times-Picayune Publishing Company distributes the leading newspaper in the area, the Times-Picayune. The 1933 acquisition of the States did not include its plant and other physical assets; since the States' absorption the Publishing Company has utilized facilities at a single plant for printing and distributing the Times-Picayune and the States. Unified financial, purchasing, and sales administration, in addition to a substantial

---

[3] 105 F. Supp. 670 (D. C. E. D. La. 1952).

[4] 15 U. S. C. (Supp. V) § 29. Probable jurisdiction was noted on November 10, 1952.

[5] The printed record here comprises 1,644 pages of testimony and exhibits of various degrees of pertinence to the issues.

segment of personnel servicing both publications, results in further joint operation. Although both publications adhere to a single general editorial policy, distinct features and format differentiate the morning Times-Picayune from the evening States. 1950 data reveal a daily average circulation of 188,402 for the Times-Picayune, 114,660 for the Item, and 105,235 for the States. The Times-Picayune thus sold nearly as many copies as the circulation of the Item and States together.

Each of these New Orleans publications sells advertising in various forms. Three principal classes of advertising space are sold: classified, general, and local display. Classified advertising, known as "want ads," includes individual insertions under various headings; general, also called national, advertising typically comprises displays by national manufacturers or wholesale distributors of brand-name goods; local, or retail, display generally publicizes bargains by local merchants selling directly to the public. From 1924 until the Morning Tribune's demise in 1941, the Item Company sold classified advertising space solely on the unit plan by which advertisers paid a single rate for identical insertions appearing in both the morning and evening papers and could not purchase space in either alone. After the Times-Picayune Publishing Company acquired the States in 1933, it offered general advertisers an optional plan by which space combined in both publications could be bought for less than the sum of the separate rates for each. Two years later it adopted the unit plan of its competitor, the Item Co., Ltd., in selling space for classified ads. General advertisers in the Publishing Company's newspapers were also availed volume discounts since 1940, but had to combine insertions in both publications in order to qualify for the substantial discounts on purchases of more than 10,000 lines per year. Local display ads as early as 1935 were marketed under a still effective volume

discount system which for determining the discount bracket in the States permitted cumulation of linage placed in the Times-Picayune as well. In 1950, however, the Publishing Company eliminated all optional plans for general advertisers, and instituted the unit plan theretofore applied solely to classified ads. As a result, since 1950 general and classified advertisers cannot buy space in either the Times-Picayune or the States alone, but must insert identical copy in both or none. Against that practice the Government levels its attack grounded on §§ 1 and 2 of the Sherman Act.

After the District Court at the outset denied the Government's motion for partial summary judgment holding the unit contracts *per se* violations of § 1, the case went to trial and eventuated in comprehensive and detailed findings of fact:[6] The Times-Picayune and the States, though published by a single publisher, were two distinct newspapers with individual format, news and feature content, reaching separate reader groups in New Orleans. The Times-Picayune, the sole local morning daily which for twenty years outdistanced the States and Item in circulation, published pages, and advertising linage, was the "dominant" newspaper in New Orleans; insertions in that paper were deemed essential by advertisers desiring to cover the local market. Although the local publishing field permits entry by additional competitors, the Item today is the sole effective daily competition which the Times-Picayune Publishing Company's two newspapers must meet. On the other hand, their quest for advertising linage encounters the competition of other media, such as radio, television, and magazines. Nevertheless, the District Court determined, the adoption of unit selling caused a substantial rise in classified and general advertising linage placed in the States,

---

[6] See R. 1252–1261.

enabling it to enhance its comparative position toward the Item. The District Court found, moreover, that the defendants had instituted the unit system, economically enforceable against buyers solely because of the Times-Picayune's "dominant" or "monopoly position," in order to "restrain general and classified advertisers from making an untrammeled choice between the States and the Item in purchasing advertising space, and also to sub-stantially diminish the competitive vigor of the Item." [7]

On the basis of these findings, the District Judge held the unit contracts in violation of the Sherman Act. The contracts were viewed as tying arrangements which the Publishing Company because of the Times-Picayune's "monopoly position" could force upon advertisers.[8] Postulating that contracts foreclosing competitors from a substantial part of the market restrain trade within the meaning of § 1 of the Act, and that effect on competition tests the reasonableness of a restraint, the court deemed a substantial percentage of advertising accounts in the New Orleans papers unlawfully "restrained." [9] Further, a violation of § 2 was found: defendants by use of the unit plan "attempted to monopolize that segment of the afternoon newspaper general and classified advertising field which was represented by those advertisers who also required morning newspaper space and who could not because of budgetary limitations or financial inability purchase space in both afternoon newspapers." [10]

Injunctive relief was accordingly decreed. The District Court enjoined the Times-Picayune Publishing Company from (A) selling advertising space in any newspaper published by it "upon the condition, expressed or implied, that the purchaser of such space will contract for

---

[7] Fdg. 31; cf. 105 F. Supp., at 678.

[8] *Ibid.*

[9] *Id.,* at 678–679.

[10] *Id.,* at 681.

or purchase advertising. space in any other newspaper published by it"; (B) refusing to sell advertising space separately in each newspaper which it publishes; (C) using its "dominant position" in the morning field "to sell any newspaper advertising at rates lower than those approximating either (1) the cost of producing and selling such advertising or (2) comparable newspaper advertising rates in New Orleans." Hence these appeals.[11]

The daily newspaper, though essential to the effective functioning of our political system, has in recent years suffered drastic economic decline. A vigorous and dauntless press is a chief source feeding the flow of democratic expression and controversy which maintains the institutions of a free society. *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945); cf. *Wieman* v. *Updegraff,* 344 U. S. 183, 191 (1952); *Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501 (1952). By interpreting to the citizen the policies of his government and vigilantly scrutinizing the official conduct of those who administer the state, an independent press stimulates free discussion and focuses public opinion on issues and officials as a potent check on arbitrary action or abuse. Cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936); *Near* v. *Minnesota,* 283 U. S. 697, 716–718 (1931). The press, in fact, "serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with

---

[11] In the light of this Court's broad interpretations of those relevant concepts, it is now beyond dispute that the activities challenged in this case are sufficiently "trade or commerce" relating to the interstate economy to fall under the wide sweep of the Sherman Act. Cf., *e. g., Lorain Journal* v. *United States,* 342 U. S. 143 (1951); *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485 (1950); *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219 (1948); *United States* v. *Frankfort Distilleries,* 324 U. S. 293 (1945); *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533 (1944); *Wickard* v. *Filburn,* 317 U. S. 111 (1942); *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.,* 293 U. S. 268 (1934).

as many different facets and colors as is possible. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." [12] Yet today, despite the vital task that in our society the press performs, the number of daily newspapers in the United States is at its lowest point since the century's turn: in 1951, 1,773 daily newspapers served 1,443 American cities, compared with 2,600 dailies published in 1,207 cities in the year 1909.[13] Moreover, while 598 new dailies braved the field between 1929 and 1950, 373 of these suspended publication during that period—less than half of the new entrants survived.[14] Concurrently, daily newspaper competition within individual cities has grown nearly extinct: in 1951, 81% of all daily newspaper cities had only one daily paper; 11% more had two or more publications, but a single publisher controlled both or all.[15] In that year, therefore, only 8% of daily newspaper cities enjoyed the clash of opinion which competition among publishers of their daily press could provide.

---

[12] Learned Hand, J., in *United States* v. *Associated Press*, 52 F. Supp. 362, 372 (D. C. S. D. N. Y. 1943), aff'd, 326 U. S. 1 (1945).

[13] Editor & Publisher 1952 International Yearbook Number, p. 17; Comment, Local Monopoly in the Daily Newspaper Industry, 61 Yale L. J. 948, 949 (1952), a comprehensive industry study. See also Ray, Economic Forces as Factors in Daily Newspaper Concentration, 29 Journ. Q. 31 (1952); Ray, Competition in the Newspaper Industry, 15 J. Marketing 444 (1951); Nixon, Concentration and Absenteeism in Daily Newspaper Ownership, 22 Journ. Q. 97 (1945).

[14] American Newspaper Publishers Association, Newspaper Mortality Since 1929 (Bulletin No. 5203, July 27, 1950). Demise of individual newspapers occurred mainly through merger with other publications or outright suspension of publication.

[15] 61 Yale L. J., at 950.

Advertising is the economic mainstay of the newspaper business. Generally, more than two-thirds of a newspaper's total revenues flow from the sale of advertising space. Local display advertising brings in about 44% of revenues; general—14%; classified—13%; circulation, almost the rest.[16] Obviously, newspapers must sell advertising to survive. And while newspapers in 1929 garnered 79% of total national advertising expenditures, by 1951 other mass media had cut newspapers' share down to 34.7%.[17] When the Times-Picayune Publishing Company in 1949 announced its forthcoming institution of unit selling to general advertisers, about 180 other publishers of morning-evening newspapers had previously adopted the unit plan.[18] Of the 598 daily newspapers which broke into publication between 1929 and 1950, 38% still published when that period closed. Forty-six of these entering dailies, however, encountered the competition of established dailies which utilized unit rates; significantly, by 1950, of these 46, 41 had collapsed.[19] Thus a newcomer in the daily newspaper business could calculate his chances of survival as 11% in cities where unit plans had taken hold. Viewed against the background of rapidly declining competition in the daily newspaper business, such a trade practice becomes suspect under the Sherman Act.

---

[16] *Id.,* at 977. Some small dailies also derive income from miscellaneous sources such as job printing. In this case the District Court found that advertising and circulation accounted for approximately 98% of New Orleans newspapers' total revenues. Fdg. 27.

[17] Mass Communications (Schramm ed. 1949), 549; Printers' Ink, August 8, 1952, p. 35. And see Borden, Taylor and Hovde, National Advertising in Newspapers, 33 *et seq.* (1946).

[18] Fdg. 26.

[19] Comparison between Bulletin, note 14, *supra,* at tables 2 and 3, and Editor & Publisher International Yearbook Numbers 1929 to 1953.

Tying arrangements, we may readily agree, flout the Sherman Act's policy that competition rule the marts of trade. Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take. Yet "[t]ying agreements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305 (1949).[20] By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the "tied" product would convince freely choosing buyers to select it over others, anyway. Thus "[i]n the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one." *Id.,* at 306. Conversely, the effect on competing sellers attempting to rival the "tied" product is drastic: to the extent the enforcer of the tying arrangement enjoys market control, other existing or potential sellers are foreclosed from offering up their goods to a free competitive judgment; they are effectively excluded from the marketplace.

---

[20] See Miller, Unfair Competition, 199 *et seq.* (1941); Lockhart and Sacks, The Relevance of Economic Factors in Determining Whether Exclusive Arrangements Violate Section 3 of the Clayton Act, 65 Harv. L. Rev. 913, 942 *et seq.* (1952); Note, 49 Col. L. Rev. 241, 246 (1949); cf. Edwards, Maintaining Competition, 175–178 (1949); Watkins, Public Regulation of Competitive Practices in Business Enterprise, 220 *et seq.* (1940).

For that reason, tying agreements fare harshly under the laws forbidding restraints of trade. *Federal Trade Commission* v. *Gratz*, 253 U. S. 421 (1920), decided that a complaint which charged a seller with conditioning his sale of steel ties on purchases of jute bagging did not, because it failed to allege his monopolistic purpose or market control, state an actionable "unfair method of competition" within the meaning of § 5 of the Federal Trade Commission Act.[21] *United Shoe Machinery Corp.* v. *United States*, 258 U. S. 451 (1922),[22] held, however, that a seller occupying a "dominant position" in the shoe machinery industry, without more, violated § 3 of the Clayton Act by contracts tying to the lease of his machines the purchase of other types of machinery and incidental supplies.[23] Potential lessening of competition, requisite to illegality under § 3, was automatically inferred from the seller's "dominating position." *Id.,* at

---

[21] "Unfair methods of competition in commerce . . . are hereby declared unlawful." 15 U. S. C. § 45. In the *Gratz* case, decided on a point of pleading, the Court observed that the "complaint contains no intimation that Warren, Jones & Gratz did not properly obtain their ties and bagging as merchants usually do; the amount controlled by them is not stated; nor is it alleged that they held a monopoly of either ties or bagging or had ability, purpose or intent to acquire one." 253 U. S., at 428. "All question of monopoly or combination," therefore, was "out of the way." *Ibid.*

[22] *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32 (1918), is not relied on by the parties.

[23] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor

457–458. *Federal Trade Commission* v. *Sinclair Refining Co.*, 261 U. S. 463 (1923), extended the principles of *Gratz* to the Clayton Act; purchases of gasoline were tied to the lease of pumps at nominal rates, but neither monopolistic purpose or power nor potential harm to competition was shown. And, in any event, the "tie" was voluntary since buyers could take the gasoline without taking the pumps. *Id.*, at 474–475. Indeed, the arrangement merely prevented lessees from dispensing other types of gasoline through the lessor's brand pumps and was thus viewed as a means of protecting the goodwill of the lessor's branded gas. See also *Pick Mfg. Co.* v. *General Motors Corp.*, 299 U. S. 3 (1936).[24] The bounds of that doctrine were drawn by *International Business Machines Corp.* v. *United States,* 298 U. S. 131 (1936). When competing sellers could meet the specifications of the "tied" product, in that case tabulating cards hitched by contract to the sale of computing machines, § 3 of the Clayton Act outlawed the tying arrangement because the "substantial" amount of commerce in the "tied" product

---

or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U. S. C. § 14.

That section relates to simple exclusive dealing arrangements, cf., *e. g., Standard Oil Co. of California* v. *United States,* 337 U. S. 293 (1949), not involved in this case, as well as to tying sales. For purposes of the Clayton Act, the requisite condition not to deal in the goods of another may be inferred from the practical effects of the tying arrangement. *International Business Machines Corp.* v. *United States,* 298 U. S. 131, 135 (1936); *Thomson Mfg. Co.* v. *Federal Trade Commission,* 150 F. 2d 952, 956 (1945); *Signode Steel Strapping Co.* v. *Federal Trade Commission,* 132 F. 2d 48, 52 (1942); *Lord* v. *Radio Corp. of America,* 24 F. 2d 565, 568 (1928). Cf. *Federal Trade Commission* v. *Sinclair Refining Co.,* 261 U. S. 463, 473–474 (1923).

[24] Affirming, per curiam, 80 F. 2d 641 (1935).

indicated potential lessening of competition as a result. *Id.*, at 136, 139.[25]

With its decision in *International Salt Co.* v. *United States,* 332 U. S. 392 (1947), this Court wove the strands of past cases into the law's present pattern. There leases of patented machines for dispensing industrial salt were conditioned on the lessees' purchase of the lessor's salt. A unanimous Court affirmed summary judgment adjudicating the arrangement unlawful under § 3 of the Clayton Act and § 1 of the Sherman Act as well. The patents on their face conferred monopolistic, albeit lawful, market control, and the volume of salt affected by the tying practice was not "insignificant or insubstantial." *Id.*, at 396. Clayton Act violation followed as a matter of course from the doctrines evolved in prior "tying" cases. See also *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 304–306, 305, nn. 7–8. And since the Court deemed it "unreasonable, *per se,* to foreclose competitors from any substantial market," neither could the tying arrangement survive § 1 of the Sherman Act. 332 U. S., at 396. That principle underpinned the decisions in the *Movie* cases, holding unlawful the "block-booking" of copyrighted films by lessors, *United States* v. *Paramount Pictures,* 334 U. S. 131, 156–159 (1948), as well as a buyer's wielding of lawful monopoly power in one market to coerce concessions that handicapped competition facing him in another. *United States* v. *Griffith,* 334 U. S. 100, 106–108 (1948). From the "tying" cases a perceptible pattern of illegality emerges: When the seller enjoys a monopolistic position in the market for the "tying" product, *or* if a substantial volume of commerce in the "tied" product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of

---

[25] See also *Signode Steel Strapping Co.* v. *Federal Trade Commission,* 132 F. 2d 48, 54 (1942); *Thomson Mfg. Co.* v. *Federal Trade Commission,* 150 F. 2d 952, 958 (1945).

the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is "unreasonable, *per se,* to foreclose competitors from any substantial market," a tying arrangement is banned by § 1 of the Sherman Act whenever *both* conditions are met.[26]  In either case, the arrangement transgresses § 5 of the Federal Trade Commission Act, since minimally that section registers violations of the Clayton and Sherman Acts. *Federal Trade Commission* v. *Motion Picture Advertising Service Co.,* 344 U. S. 392, 395 (1953); *Federal Trade Commission* v. *Cement Institute,* 333 U. S. 683, 690–694 (1948); *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457, 463 (1941).

In this case, the rule of *International Salt* can apply only if both its ingredients are met. The Government at the outset elected to proceed not under the Clayton but the Sherman Act.[27]  While the Clayton Act's more specific standards illuminate the public policy which the Sherman Act was designed to subserve, *e. g., United States*

---

[26] Dealing with a monopolization offense under Sherman Act § 2, a charge not raised or considered here, the Court in *United States* v. *Griffith,* 334 U. S. 100, 106–108 (1948), pointedly observed: "Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense.  But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. . . .  [T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful. . . .  If monopoly power can be used to beget monopoly, the Act becomes a feeble instrument indeed." See also Levi, A Two Level Anti-Monopoly Law, 47 Northwestern U. L. Rev. 567, 580–585 (1952).

[27] On oral argument here, the Government explanatorily referred to an early informal Federal Trade Commission opinion to the effect that advertising space was not a "commodity" within the meaning

v. *Columbia Steel Co.*, 334 U. S. 495, 507, n. 7 (1948);
*Fashion Originators' Guild* v. *Federal Trade Commission*,
312 U. S. 457, 463 (1941), the Government here must
measure up to the criteria of the more stringent law. See
*Standard Oil Co. of California* v. *United States*, 337 U. S.
293, 297, 311–314 (1949); *United Shoe Machinery Corp.*
v. *United States*, 258 U. S. 451, 459–460 (1922).

Once granted that the volume of commerce affected was
not "insignificant or insubstantial," [28] the Times-Pica-
yune's market position becomes critical to the case. The
District Court found that the Times-Picayune occupied a
"dominant position" in New Orleans; the sole morning
daily in the area, it led its competitors in circulation,
number of pages and advertising linage. But every
newspaper is a dual trader in separate though interde-
pendent markets; it sells the paper's news and advertising
content to its readers; in effect that readership is in turn
sold to the buyers of advertising space. This case con-
cerns solely one of these markets. The Publishing Com-
pany stands accused not of tying sales to its readers but
only to buyers of general and classified space in its papers.
For this reason, dominance in the advertising market, not
in readership, must be decisive in gauging the legality of
the Company's unit plan. Cf. *Lorain Journal* v. *United
States*, 342 U. S. 143, 149–150, 152–153 (1951); *United*

of § 2 of the Clayton Act (cf. note 23, *supra*). 81 Cong. Rec. App.
2336-2337. Cf. *Fleetway, Inc.* v. *Public Service Interstate Transp.
Co.*, 72 F. 2d 761 (1934); *United States* v. *Investors Diversified
Services*, 102 F. Supp. 645 (1951). We express no views on that
statutory interpretation. Compare note 11, *supra*.

[28] The District Court in this case did not find the volume of
commerce affected by the restraint, but determined solely that a
substantial percentage of advertising accounts in New Orleans papers
was restrained by the Publishing Company's unit plan. Fdg. 30;
cf. Fdg. 22. In view of our disposition of this case we may assume,
though not deciding, that the Sherman Act's substantiality test was
met.

*States* v. *Paramount Pictures, supra,* at 166–167; *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.,* 293 U. S. 268, 278–279 (1934).

The "market," as most concepts in law or economics, cannot be measured by metes and bounds. Nor does the substance of Sherman Act violations typically depend on so flexible a guide. Section 2 outlaws monopolization of any "appreciable part" of interstate commerce, and by § 1 unreasonable restraints are banned irrespective of the amount of commerce involved. *Lorain Journal* v. *United States, supra,* at 151, n. 6; *United States* v. *Paramount Pictures, supra,* at 173; *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 225–226 (1947).[29] But the essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next. Solely for testing the strength of that lever, the whole and not part of a relevant market must be assigned controlling weight. Cf. *United States* v. *Columbia Steel Co., supra,* at 524.

We do not think that the Times-Picayune occupied a "dominant" position in the newspaper advertising market in New Orleans. Unlike other "tying" cases where patents or copyrights supplied the requisite market control, any equivalent market "dominance" in this case must rest on comparative marketing data.[30] Excluding ad-

---

[29] See also *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 224, n. 59 (1940); *Gamco, Inc.* v. *Providence Fruit & Produce Bldg.,* 194 F. 2d 484 (1952); *White Bear Theatre Corp.* v. *State Theatre Corp.,* 129 F. 2d 600 (1942).

[30] "A patent, . . . although in fact there may be many competing substitutes for the patented article, is at least *prima facie* evidence of [market] control." *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 307 (1949). Cf. *id.,* at 303; *Oxford Varnish Corp.* v. *Ault & Wiborg Corp.,* 83 F. 2d 764, 766 (1936); Miller, Unfair Competition (1941), 199; Lockhart and Sacks, note 20, *supra,* at 943–944; Note, 49 Col. L. Rev. 241, 243 (1949).

vertising placed through other communications media and including general and classified linage inserted in all New Orleans dailies, as we must since the record contains no evidence which could circumscribe a broader or narrower "market" defined by buyers' habits or mobility of demand,[31] the Times-Picayune's sales of both general and classified linage over the years hovered around 40%.[32] Obviously no magic inheres in numbers; "the relative effect of percentage command of a market varies with the setting in which that factor is placed." *United States* v. *Columbia Steel Co., supra,* at 528; cf. *United States* v. *National Lead Co.,* 332 U. S. 319, 352–353 (1947). If each of the New Orleans publications shared equally in the total volume of linage, the Times-Picayune would have sold 33⅓%; in the absence of patent or copyright control, the small existing increment in the circumstances here disclosed [33] cannot confer that market

---

[31] For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose "cross-elasticities of demand" are small. Useful to that determination is, among other things, the trade's own characterization of the products involved. The advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media. See, *e. g.,* Frey, Advertising (2d ed. 1953), cc. 12, 15; Duffy, Advertising Media and Markets (2d ed. 1951), cc. 3, 4; Hepner, Effective Advertising, c. 20 (1949); Borden, Taylor and Hovde, National Advertising in Newspapers, *passim* (1946); Sandage, Advertising Theory and Practice (3d ed. 1948), cc. XX, XXI.

[32] See tables, notes 37 and 39, *infra.*

[33] Cf., *e. g.,* situations where several competitors together controlling a large share of the market acting individually or in concert adopt an identical trade practice. See *Federal Trade Commission* v. *Motion Picture Advertising Service Co.,* 344 U. S. 392 (1953); *Signode Steel Strapping Co.* v. *Federal Trade Commission,* 132 F. 2d 48, 54 (1942). And, obviously, if a producer controlling an even

"dominance" which, in conjunction with a "not insubstantial" volume of trade in the "tied" product, would result in a Sherman Act offense under the rule of *International Salt.*

Yet another consideration vitiates the applicability of *International Salt.* The District Court determined that the Times-Picayune and the States were separate and distinct newspapers, though published under single ownership and control. But that readers consciously distinguished between these two publications does not necessarily imply that advertisers bought separate and distinct products when insertions were placed in the Times-Picayune and the States. So to conclude here would involve speculation that advertisers bought space motivated by considerations other than customer coverage; that their media selections, in effect, rested on generic qualities differentiating morning from evening readers in New Orleans. Although advertising space in the Times-Picayune, as the sole morning daily, was doubtless essential to blanket coverage of the local newspaper readership, nothing in the record suggests that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential.[34] We must assume, therefore, that the readership "bought" by advertisers in the Times-Picayune was the selfsame "product" sold by the States and, for that matter, the Item.

---

lesser share than here is ringed by numerous smaller satellites together accounting for the rest, his mastery of the market is greater than were he facing fierce rivalry of other large sellers. Cf. *United States* v. *National Lead Co.,* 332 U. S. 319, 346–348, 352–353 (1947); *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 527–528 (1948). Fewness of sellers, on the other hand, may facilitate concerted action. See Fellner, Competition Among the Few (1949), *passim;* Stigler, The Theory of Price, 228 *et seq.* (Rev. ed. 1952).

[34] In fact, a survey (R. 1484) in 1940 disclosed that 27.6% of States home carrier subscribers subscribed to the Times-Picayune by home carrier as well.

The factual departure from the "tying" cases then becomes manifest. The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant "tying" product, resulting in economic harm to competition in the "tied" market. Here, however, two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant "tying" product exists (in fact, since space in neither the Times-Picayune nor the States can be bought alone, one may be viewed as "tying" as the other); no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same. Cf. *Standard Oil Co. (Indiana)* v. *United States,* 283 U. S. 163, 176–178 (1931); *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 424 (1945); compare *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.,* 293 U. S. 268, 278–280 (1934). In short, neither the rationale nor the doctrines evolved by the "tying" cases can dispose of the Publishing Company's arrangements challenged here.

The Publishing Company's advertising contracts must thus be tested under the Sherman Act's general prohibition on unreasonable restraints of trade. For purposes of § 1, "[a] restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal *per se.*" *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 522 (1948). Since the requisite intent is inferred whenever unlawful effects are found, *United States* v. *Griffith,* 334 U. S. 100, 105, 108 (1948); *United States* v. *Patten,* 226 U. S. 525, 543 (1913), and the rule of *International Salt* is out of the way, the contracts may yet be banned by § 1 if unreasonable restraint was either their object or effect. Although these unit contracts do not in

express terms preclude buyers from purchasing additional space in competing newspapers, the Act deals with competitive realities, not words. *United States* v. *Masonite Corp.,* 316 U. S. 265, 280 (1942). Thus, while we "do not think this concession relieves the contract of being a restraint of trade, albeit a less harsh one" than otherwise, *International Salt Co.* v. *United States,* 332 U. S. 392, 397 (1947); see *United States* v. *Paramount Pictures,* 334 U. S. 131, 156–158 (1948),[35] the "open end" feature of the contracts here minimizes the restraint. For our inquiry to determine reasonableness under § 1 must focus on "the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize." 334 U. S., at 527; compare *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 312-313 (1949).

The record is replete with relevant statistical data. The volume discounts available to local display buyers were not held unlawful by the District Court, and the Government does not assail the practice here. That segment of advertising linage, by far the largest revenue producer of the three linage classes sold by all New Orleans newspapers,[36] is thus eliminated from consideration.

---

[35] In *International Salt,* the lessor's tying arrangement permitted the lessee's purchase of the "tied" product in the open market whenever the lessor declined to match the going market price. That, this Court thought, "does not avoid the stifling effect of the agreement on competition. The [lessor] had at all times a priority on the business at equal prices." 332 U. S., at 397. And the "block-booking" found unlawful in the *Paramount* case did not, of course, impose any express restrictions on licensees desiring to acquire additional films elsewhere. In fact, by specifying that a particular amount of the "tied" product be taken and that amount covers the buyer's total requirements, a tying arrangement may achieve a result equivalent to total exclusion of other sellers without the formality of expressly saying so. See also note 23, *supra.*

[36] See 61 Yale L. J., at 977, n. 162; note 43, *infra.*

Consequently, only classified and display linage data can be scrutinized for possible forbidden effects.

*Classified.*—The Item Company, then publishing the Morning Tribune and the evening Item, utilized unit rates for classified advertising in its papers in the year the Times-Picayune Company absorbed the evening States. In 1933, the Item Company's classified linage totaled 2.72 million, compared with the Times-Picayune Company's total of 2.12 million.[37] Equalizing the competitive relationship, the Times-Picayune Company in 1935 countered by adopting the unit-rate system of its rival. In that year the Times-Picayune sold 2.84 million, to the Item Company's 2.35 million, lines. While thus

---

[37] These and the following classified advertising data are derived from the table below (R. 1448):

*Classified Advertising Linage Carried by New Orleans Daily Newspapers, 1933–1950*

| | Times-Picayune Morning | States Evening | Item Evening | Tribune Morning |
|---|---|---|---|---|
| 1933_____ | 1, 484, 740 | 633, 332 | 1, 369, 729 | 1, 349, 577 |
| 1934_____ | 1, 344, 479 | 642, 347 | 1, 185, 832 | 1, 142, 753 |
| 1935_____ | 1, 490, 316 | 1, 344, 849 | 1, 180, 850 | 1, 169, 733 |
| 1936_____ | 1, 789, 838 | 1, 786, 773 | 1, 308, 983 | 1, 298, 880 |
| 1937_____ | 1, 832, 728 | 1, 834, 845 | 1, 252, 840 | 1, 228, 357 |
| 1938_____ | 1, 761, 830 | 1, 759, 477 | 1, 113, 160 | 1, 113, 115 |
| 1939_____ | 1, 881, 673 | 1, 882, 970 | 1, 097, 277 | 1, 086, 777 |
| 1940_____ | 1, 954, 535 | 1, 955, 117 | 1, 277, 140 | *1, 248, 712 |
| 1941_____ | 2, 085, 566 | 2, 083, 812 | 1, 231, 540 | |
| 1942_____ | 1, 954, 870 | 1, 957, 057 | 910, 275 | |
| 1943 _____ | 2, 849, 190 | 2, 843, 097 | 1, 241, 787 | |
| 1944_____ | 3, 021, 616 | 3, 027, 236 | 1, 857, 741 | |
| 1945_____ | 3, 246, 566 | 3, 265, 686 | 1, 899, 926 | |
| 1946_____ | 3, 930, 313 | 4, 083, 664 | 2, 181, 640 | |
| 1947_____ | 4, 353, 943 | 4, 507, 427 | 2, 210, 193 | |
| 1948_____ | 4, 501, 599 | 4, 664, 403 | 2, 437, 268 | |
| 1949_____ | 4, 271, 302 | 4, 420, 193 | 2, 232, 617 | |
| 1950_____ | 4, 357, 713 | 4, 549, 238 | 2, 166, 518 | |

*Morning Tribune discontinued (January 1941).

evenly matched, the Times-Picayune over the years steadily increased its lead. That Company sold 3.52 million lines in 1938, and 3.76 in 1939; the Item Company totaled 2.23 and 2.18, respectively. In fact the Times-Picayune Publishing Company in every year but 1938 advanced its linage total; since 1936 the Item Company's totals declined yearly, solely excepting 1940.

At the end of that year the Item Company's Morning Tribune suspended publication; [38] a new local competitive structure took form. In that first year the Item, as sole competitor of the Times-Picayune Company's two dailies, sold 1.23 million lines of classified linage, compared with 2.09 million for the Times-Picayune and 2.08 for the States; the Item's share thus accounted for roughly 23% of the total. Ten years later the Item's share had declined to approximately 20%: in 1950 it sold 2.17 million lines, compared with the Times-Picayune Publishing Company's total linage of 8.91 million, comprising 4.36 million for the Times-Picayune and 4.55 for the States. Measured against the evening States alone, the Item's percentage attrition is comparable. In 1941 it sold 37% of the two evening papers' total linage; by 1950 that share had declined to 32%. Thus, over a period of ten years' competition while facing its morning-evening rival's compulsory unit rate the New Orleans Item's share of the New Orleans classified linage market declined 3%; viewed solely in relation to its evening competitor, its percentage loss amounted to 5%.

*General Display.*—Because the unit rate applicable to general display linage was instituted to become effective 1950, only one year's comparative data are in the record. In 1949, general display linage in all New Orleans dailies

---

[38] This record contains no evidence explaining the Morning Tribune's demise. We must therefore assume that the Times-Picayune Publishing Company's challenged trade practices are in no way linked to the suspension of that competing daily newspaper.

totaled 6.84 million, comprising 3.04 million lines in the Times-Picayune, 1.93 million in the States, and 1.87 million in the Item; the Publishing Company ran 73% of the total.[39]   One year's experience with the unit rate for

---

[39] All general display advertising data are derived from the table below (R. 1450):

*General Display Advertising Linage Carried by New Orleans Daily Newspapers, 1949–1950*

|  | Times-Picayune Morning | States Evening | Item Evening |
|---|---|---|---|
| *1949—Monthly  Totals* | | | |
| Jan | 190, 708 | 130, 761 | 110, 940 |
| Feb | 231, 656 | 158, 252 | 154, 008 |
| March | 305, 782 | 205, 740 | 183, 383 |
| April | 295, 603 | 179, 186 | 164, 288 |
| May | 282, 080 | 171, 509 | 177, 725 |
| June | 275, 249 | 162, 481 | 165, 681 |
| July | 227, 896 | 136, 380 | 133, 669 |
| Aug | 180, 019 | 118, 031 | 124, 768 |
| Sept | 248, 078 | 154, 362 | 151, 187 |
| Oct | 291, 072 | 200, 552 | 181, 548 |
| Nov | 281, 356 | 173, 898 | 157, 516 |
| Dec | 228, 701 | 143, 780 | 165, 741 |
| Total | 3, 038, 200 | 1, 934, 932 | 1, 870, 454 |
| *1950—Monthly  Totals* | | | |
| Jan | 237, 517 | 171, 564 | 176, 184 |
| Feb* | 229, 367 | 166, 536 | 167, 309 |
| March | 283, 568 | 210, 413 | 164, 734 |
| April | 262, 997 | 199, 803 | 162, 523 |
| May | 276, 036 | 229, 662 | 154, 058 |
| June | 260, 248 | 222, 657 | 170, 420 |
| July | 213, 550 | 194, 800 | 121, 387 |
| Aug | 181, 522 | 176, 400 | 115, 256 |
| Sept | 241, 167 | 221, 574 | 147, 051 |
| Oct | 300, 757 | 293, 723 | 158, 052 |
| Nov | 265, 956 | 266, 869 | 168, 339 |
| Dec | 211, 735 | 196, 794 | 148, 630 |
| Total | 2, 964, 420 | 2, 550, 795 | 1, 853, 943 |

*Unit rate became effective on Feb. 1, 1950.

general display advertising showed a New Orleans total volume of 7.37 million lines, roughly apportioned as 2.96 million in the Times-Picayune, 2.55 million in the States, and 1.85 million in the Item; the Publishing Company's share had risen to 75%. Compared with the States alone, the Item in 1949 accounted for 49% of the two evening papers' total; in 1950, that had declined to 42%.

In that year, a reallocation of advertising accounts also took place.[40] In 1949, 23.7% of general display advertisers utilized the Times-Picayune Publishing Company's publications exclusively; one year later that percentage had risen to 41%. Concurrently, however, accounts advertising solely in the Times-Picayune declined from 22.7% to 5.8%, and sole advertisers in the States dropped from 2% to .4%. On the other hand, in 1950 10.6%, compared with 9.6% the year before, of general display accounts inserted solely in the Item; and the segment of advertising accounts inserting in all three publications rose from 30.4% in 1949 to 39% in the following year. In fact, while in 1949 only 51.6% of general display accounts utilized the Item either exclusively or in conjunction with other New Orleans dailies, one year later 52.8% of the accounts so patronized the Item.

The record's factual data, in sum, do not demonstrate that the Publishing Company's advertising contracts unduly handicapped its extant competitor, the Item. In the early years when four-cornered newspaper competition for classified linage prevailed in New Orleans, the ascendancy of the Publishing Company's papers over their morning-evening competitor soon became manifest. With unit plan pitted on even terms against unit plan, over the years the local market pattern steadily evolved

---

[40] Data are derived from tables and graphs at R. 1453–1456.

from the Times-Picayune Company's rise and the Item Company's decline. With the Morning Tribune's demise in 1940, the market shrank but the pattern remained. The Item continued its gradually declining share of the market, though in fact the Times-Picayune's unit rate for "classified" between 1940 and 1950 coincided with a reversal of the trend marking the Item's absolute volume decline. Even less competitive hurt is discernible from the Publishing Company's unit rate for general display linage. True, in the single recorded year of its existence the combination plan did diminish by 7% the Item's share of linage if measured solely against the States. Versus the linage sold by the Publishing Company in its two newspapers, however, the Item's share of the total market declined but 2%. That apparent incongruity is simply explained: Compared with 1949 monthly volume data, the unit rate in each of the 11 months of its operation in 1950 drew linage away from the Times-Picayune and toward the States.[41] In effect, the Publishing Company's unit plan merely reallocated the linage sold by its two constituent papers. And not only did the unit plan take from the Times-Picayune and give to the States. Apparently it also led more advertisers to insert in the Item, which sold general display space to a proportionately greater number of accounts in 1950 than in 1949.

Meanwhile the Item flourishes. The ten years preceding this trial marked its more than 75% growth in classified linage. Between 1946 and 1950 its general display volume increased almost 25%. The Item's local display linage is twice the equivalent linage in the States.[42] And 1950, the Item's peak year for total linage comprising all three classes of advertising, marked its greatest

---

[41] See table at note 39, *supra*.

[42] Media Records, 11 (1950).

circulation in history as well. In fact, since in newspapers of the Item's circulation bracket general display and classified linage typically provide no more than 32% of total revenues, the demonstrated diminution of its New Orleans market shares in these advertising classes might well not have resulted in revenue losses exceeding 1%.[43] Moreover, between 1943 and 1949 the Item earned over $1.4 million net before taxes, enabling its then publisher in the latter year to transfer his equity at a net profit of $600,000. The Item, the alleged victim of the Times-Picayune Company's challenged trade practices, appeared, in short, to be doing well.

The record in this case thus does not disclose evidence from which demonstrably deleterious effects on competition may be inferred. To be sure, economic statistics are easily susceptible to legerdemain, and only the organized context of all relevant factors can validly translate raw data into logical cause and effect. But we must take the record as we find it, and hack through the jungle as best we can. It may well be that any enhancement of the Times-Picayune's market position during the period of the assailed arrangements resulted from better

---

[43] For the average daily newspaper of greater than 100,000 circulation, a 1951 industry survey revealed the following typical percentage sources of total revenues (Editor & Publisher, April 12, 1952, p. 74):

| | |
|---|---|
| Local display | 37.24% |
| General display | 16.98% |
| Classified advertising | 14.60% |
| Circulation | 29.47% |

A 3% decline in classified advertising, accounting for 14.6% of total revenues, and a 2% loss in general display, responsible for 16.98% of revenues, would amount to a total revenue loss of .78%. Compare *Federal Trade Commission* v. *Morton Salt Co.,* 334 U. S. 37 (1948), where the composition of a buyer's inventory necessitated protection against competitive harm in the purchasing of even a fractional part of his stock in trade. *Id.,* at 49.

service or lower prices, or was due to superior planning initiative or managerial skills; [44] conversely, it is equally possible that but for the adoption of the unit contracts its market position might have turned for the worse. Nor can we be certain that the challenged practice, though not destructive of existing competition, did not abort yet unborn competitors equally within the concern of the Sherman Act. See *United States* v. *Griffith,* 334 U. S. 100, 107 (1948); *American Tobacco Co.* v. *United States,* 328 U. S. 781, 814 (1946); *Associated Press* v. *United States,* 326 U. S. 1, 13 (1945). But this suit was not brought to adjudicate a trade practice as banned by specific statutory prohibitions which by a clearly defined public policy dispense with difficult standards of economic proof. Compare *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 311–313 (1949). And the case has not met the *per se* criteria of Sherman Act § 1 from which proscribed effect automatically must be inferred. Cf. *International Salt Co.* v. *United States,* 332 U. S. 392 (1947). Under the broad general policy directed by § 1 against unreasonable trade restraints, guilt cannot rest on speculation; the Government here has proved neither actual unlawful effects nor facts which radiate a potential for future harm.

While even otherwise reasonable trade arrangements must fall if conceived to achieve forbidden ends, legitimate business aims predominantly motivated the Publishing Company's adoption of the unit plan. Because the antitrust laws strike equally at nascent and accom-

---

[44] The record does, in fact, contain evidence demonstrating that the Times-Picayune Publishing Company's milline rates (cost to advertisers of one agate line per million circulation) ranged roughly from $2.14 to $1.96, compared to the Item's corresponding rates from $2.96 to $2.58. R. 296, 1115. Moreover, though no inference necessarily flows from that fact, the Item changed ownership at least twice in the past twenty years.

plished restraints of trade, monopolistic designs as well as results are reached by the prohibitions of the Sherman Act. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 224, n. 59 (1940); *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 402 (1927). The unit rate for classified advertising, however, was adopted in 1935 obviously to counteract the competition of the Item and Morning Tribune which confronted the Times-Picayune Publishing Company with an established unit rate. To be sure, an unlawful trade practice may not be justified as an emulation of another's illegal plan. Cf. *Federal Trade Commission* v. *Staley Mfg. Co.,* 324 U. S. 746, 753–754 (1945). But that factor is certainly relevant to illuminate ambiguous intent, particularly when planned injury to that other competitor is the crux of the charge. In any event, uncontradicted testimony suggests that unit insertions of classified ads substantially reduce the publisher's overhead costs.[45] Approximately thirty separate operations are necessary to translate an advertiser's order into a published line of print. A reasonable price for a classified ad is necessarily low. And the Publishing Company processed about 2,300 classified ads for publication each day. Certainly a publisher's steps to rationalize that operation do not bespeak a purposive quest for monopoly or restraint of trade.

Similarly, competitive business considerations apparently actuated the adoption of the unit rate for general display linage in 1950. At that time about 180 other publishers, the vast majority of morning-evening owners, had previously instituted similar unit plans. Doubtless, long-tolerated trade arrangements acquire no vested immunity under the Sherman Act; no prescriptive rights

---

[45] R. 1127–1129. Cf. Borden, Taylor and Hovde, National Advertising in Newspapers, 461–462 (1946). Obviously, equivalent economies flow from voluntary unit insertions.

624

accrue by the prosecutor's delay. Cf. *United States* v. *Socony-Vacuum Oil Co., supra,* at 225–228. That consideration, however, is not wholly irrelevant when monopolistic purpose rather than effect remains to be gauged. *Ibid.* By adopting the unit plan for general display linage at the time it did, the Publishing Company devised not a novel restrictive scheme but aligned itself with the industry's guide, legal or illegal in particular cases that is found to be. Moreover, the unit rate was viewed as a competitive weapon in the rivalry for national advertising accounts. Lower milline rates visualized as a consequence of unit insertions might attract national linage from advertisers utilizing newspapers in other cities, as well as counteract a national advertisers' trend away from newspapers toward other mass communications media.[46] In summary, neither unlawful effects nor aims are shown by the record.[47]

Consequently, no Sherman Act violation has occurred unless the Publishing Company's refusal to sell advertis-

---

[46] But cf. *id.,* at 461–464; Nixon, Concentration and Absenteeism in Daily Newspaper Ownership, 22 Journ. Q. 97, 110–113 (1945), for advertisers' reactions to unit rates.

[47] The Government places much emphasis on a memorandum prepared by the Publishing Company's advertising representatives, referring to the Company's adoption of the unit plan as one way "to eliminate to a great extent the deleterious selling on the part of our evening contemporary which in the long run is not to the best interests of the manufacturer." As pointed out by the District Court, however, the author of the memorandum explained that "in a number of cases . . . the advertising agencies favored the compulsory or unit rate, because once an agency had made its selection or its recommendation of media to the advertiser, the agency could resist any pressure brought to make a change in media by pointing to the unit rate as making such change impossible." 105 F. Supp., at 675–676. That explanation accords with prevailing agency practices and attitudes. See Borden, Taylor and Hovde, National Advertising in Newspapers, 207–212 (1946).

ing space except *en bloc,* viewed alone, constitutes a violation of the Act. Refusals to sell, without more, do not violate the law.[48] Though group boycotts, or concerted refusals to deal, clearly run afoul of § 1, *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 214 (1951); *Associated Press* v. *United States,* 326 U. S. 1 (1945); see *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 522 (1948), different criteria have long applied to qualify the rights of an individual seller. Beginning with *United States* v. *Colgate & Co.,* 250 U. S. 300 (1919), this Court's decisions have recognized individual refusals to sell as a general right, though "neither absolute nor exempt from regulation." *Lorain Journal* v. *United States,* 342 U. S. 143, 155 (1951). If accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the Act. *Lorain Journal* v. *United States, supra; United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, 721–723 (1944); *Eastman Kodak Co.* v. *Southern Photo Materials Co.,* 273 U. S. 359, 375 (1927); *United States* v. *Schrader's Son, Inc.,* 252 U. S. 85, 99 (1920); cf. *American Tobacco Co.* v. *United States,* 328 U. S. 781, 808 (1946); *Federal Trade Commission* v. *Beech-Nut Packing Co.,* 257 U. S. 441, 453–455 (1922).[49]

---

[48] See, generally, Comment, Refusals to Sell and Public Control of Competition, 58 Yale L. J. 1121 (1949).

[49] And see *United States* v. *Klearflax Linen Looms,* 63 F. Supp. 32 (1945). "[I]f all the newspapers in a city, in order to monopolize the dissemination of news and advertising by eliminating a competing radio station, conspired to accept no advertisements from anyone who advertised over that station, they would violate §§ 1 and 2 of the Sherman Act. [Citing cases.] It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal* v. *United States,* 342 U. S. 143, 154 (1951).

626

Still, although much hedged about by later cases, *Colgate's* principle protects the Times-Picayune Publishing Company's simple refusal to sell advertising space in the Times-Picayune or States separately unless other factors destroy the limited dispensation which that case confers.

In our view, however, no additional circumstances bring this case within § 1. Though operating two constituent newspapers, the Times-Picayune is a single corporation, and the Government in the District Court abandoned a charge of unlawful concert among the corporate officers.[50] With the advertising contracts in this proceeding viewed as in themselves lawful and no further elements of combination apparent in the case, § 2 criteria must become dispositive here.

An insufficient showing of specific intent vitiates this part of the Government's case. While the completed offense of monopolization under § 2 demands only a general intent to do the act, "for no monopolist monopolizes unconscious of what he is doing," a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt now charged. *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 431-432 (1945); *United States* v. *Griffith,* 334 U. S. 100, 105 (1948); *American Tobacco Co.* v. *United States,* 328 U. S. 781, 814 (1946); *Swift & Co.* v. *United States,* 196 U. S. 375, 396 (1905). This case does not demonstrate an attempt by a monopolist established in one area to nose into a second market, so that past monopolistic success both enhances the probability of future harm and supplies a motivation for further forays. Cf. *United States* v. *Griffith, supra; Swift & Co.* v. *United States, supra.*

[50] Compare *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 598, 606 (1951); *Nelson Radio & Supply Co.* v. *Motorola,* 200 F. 2d 911, 914 (1952); *United States* v. *Lorain Journal,* 92 F. Supp. 794, 799-800 (1950).

And unlike *Lorain Journal* v. *United States,* 342 U. S. 143 (1951), where a single newspaper's refusal to sell space to advertisers unless they forewent advertising over a competing local radio station manifested "bold, relentless, and predatory commercial behavior," *id.,* at 149, no remotely comparable charge is borne out here. This branch of the Government's case comprised allegations that the Publishing Company's acquisition of the States in 1933 was one element in a cool and calculated quest for monopoly control; that the Company deliberately operated the evening States at a financial loss to the detriment of the competing Item; and that it interfered with the Item's distribution on the streets of New Orleans. The District Court, and much evidence supports its conclusions, determined that the 1933 purchase of the States then seemed a legitimate means of business expansion; assumed that the Company's cost and revenue allocations between its two publications were mere bookkeeping transactions without economic significance; and concluded that the Company rather than obstruct street sales of the Item merely sought to assure equal treatment by news vendors of the Item and States.[51] Because these pillars of the Government's § 2 case thus collapsed in the District Court, only the adoption of the unit rates remains to support the alleged violation of § 2 of the Sherman Act. Since we have viewed that step as predominantly motivated by legitimate business aims, this record cannot bear out the specific intent essential to sustain an attempt to monopolize under § 2.

We conclude, therefore, that this record does not establish the charged violations of § 1 and § 2 of the Sherman Act. We do not determine that unit advertising arrangements are lawful in other circumstances or in other proceedings. Our decision adjudicates solely

---

[51] 105 F. Supp., at 676–677, 680.

that this record cannot substantiate the Government's view of this case. Accordingly, the District Court's judgment must be

Reversed.

MR. JUSTICE BURTON, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE MINTON join, dissenting.

The majority opinion seeks to avoid the effect of *United States* v. *Griffith,* 334 U. S. 100, and of *International Salt Co.* v. *United States,* 332 U. S. 392, by taking the position that the Times-Picayune does not enjoy a "dominant position" in the general newspaper advertising market of New Orleans, including all three papers, as a single market. The complaint, however, is not and need not be dependent upon the relation of the Times-Picayune to that entire market.

The complaint is that the Times-Picayune enjoys a distinct, conceded and complete monopoly of access to the morning newspaper readers in the New Orleans area and that it uses that monopoly to restrain unreasonably the competition between its evening newspaper, the New Orleans States, and the independent New Orleans Item, in the competitive field of evening newspaper advertising. Insistence by the Times-Picayune upon acceptance of its compulsory combination advertising contracts makes payment for, and publication of, classified and general advertising in its own evening paper an inescapable part of the price of access to the all-important columns of the single morning paper. I agree with the District Court that such conduct violates the Sherman Act under the circumstances here presented. See also, Fed. Rules Civ. Proc., 52 (a), "Findings of fact shall not be set aside unless clearly erroneous . . ." and *Lorain Journal Co.* v. *United States,* 342 U. S. 143. In view of the disposition made of this case by the majority, it is not necessary to discuss the terms of the decree.