SEA–LAND SERVICE, INC., Plaintiff,

v.

ATLANTIC PACIFIC INTERNATION-AL, INC.; A & A Consolidators, Inc. Fleming Companies, Inc.; John Does 1–25, Defendants.

and

Fleming Companies, Inc.,
Defendant/Third–Party
Plaintiff,

v.

Jack Borja and Heidi L. Borja,
Third–Party Defendants,

and

Atlantic Pacific International,
Inc., Defendant/Third–
Party Plaintiff,

v.

Matson Navigation Services, Inc., a Hawaii corporation; Costco Wholesale Corporation, a Washington corporation; Wal–Mart Stores, Inc. dba Sam's Club, a Delaware corporation; TAG/ICIB Services, Inc., a Delaware corporation, Third–Party Defendants,

and

Sea–Land Service, Inc.,
Plaintiff/Fourth–Party
Plaintiff,

v.

Jack Borja and Heidi L. Borja,
Fourth–Party Defendants.

No. 98–00369 DAE.

United States District Court,
D. Hawaii.

July 12, 1999.

Gregory W. Kugle, Damon Key Bocken Leong & Kupchak, Honolulu, HI, Deborah E. Barack, Carlsmith Ball Wichman Case & Ichiki, Honolulu, HI, for Sea–Land Service, Inc., plaintiff.

Timothy J. Hogan, Lynch Ichida Thompson & Kim, Honolulu, Hi, for Atlantic Pacific International Inc., A & A Consolidators, Inc., defendants.

Craig K. Shikuma, Kobayashi Sugita & Goda, Honolulu, HI, for Fleming Companies, Inc., defendant.

David C. Farmer, Ashford & Wriston, Honolulu, Hi, for Jack Borja, Heidi L. Borja, third–party defendants.

Lisa W. Munger, Lindalee K. Farm, Goodsill Anderson Quinn & Stifel, Honolulu, HI, for Costco Wholesale Corporation a Washington Corporation, third–party defendant.

Bruce C. Bigelow, Case Bigelow & Lombardi, Honolulu, HI, for Wal–Mart Stores, Inc., dba Sam's Club, third–party defendant.

Kenneth A. Remson, Jones Day Reavis & Pogue, Los Angeles, CA, Jeffrey S. Portnoy, Cades Schutte Fleming & Wright, Honolulu, HI, for TAG/ICIB Services, Inc., a Delaware Corporation third–party defendant.

*ORDER GRANTING IN PART AND DENYING IN PART SEA–LAND SERVICE, INC.'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT ON FLEMING COMPANIES, INC.'S COUNTERCLAIM*

DAVID ALAN EZRA, Chief Judge.

The court heard Sea–Land's motion on May 18, 1999. Gary G. Grimmer, Esq., and Deborah E. Barack, Esq., appeared at the hearing on behalf of Sea–Land Service, Inc.; Bert T. Kobayashi, Jr., Esq., and Craig K. Shikuma, Esq., appeared at the hearing on behalf of Defendant Fleming Companies, Inc. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS in part

and DENIES in part Sea–Land Service, Inc.'s Motion to Dismiss and/or for Summary Judgment on Fleming Companies, Inc.'s Counterclaim.

## BACKGROUND

On May 7, 1998, Plaintiff Sea–Land Service, Inc. ("Sea–Land") filed a Complaint against Defendants Atlantic Pacific International, Inc. ("API"), A & A Consolidators, Inc. ("A & A"), and Fleming Companies, Inc. ("Fleming") (collectively "Defendants"), seeking to recover unpaid ocean freight charges. In response, Fleming asserted a counterclaim against Sea–Land, alleging state and federal antitrust violations.

API, a freight consolidator, arranged with Sea–Land, a common carrier, to ship cargo from the West Coast to Hawaii on behalf of Fleming, a wholesale food marketer and distributor. Sea–Land provides transportation services based on rates contained in tariffs. These tariffs are published and filed with the Surface Transportation Board ("STB"). Although Sea–Land does not assess a separate charge for the use of its cargo containers during transportation, the cost of the containers is included in the cost of shipping. Once the cargo reaches its destination, Sea–Land charges a detention fee for continued use of the containers after the period of time ("free time") allowed by the tariff. Essentially, customers have a specified period of time in which to unload their cargo and return the containers to Sea–Land before Sea–Land will impose the detention fee.

Rule 884 of Freight Tariff No. 486 allows shippers to transport goods on Sea–Land's vessels in shipper-owned or leased containers, provided that such containers meet Sea–Land's construction and size specifications. At least two of Sea–Land's customers use shipper-owned containers. Sea–Land charges the same shipping rates regardless of whether a customer employs shipper-owned containers or uses Sea–Land's containers.

TAG/ICIB Services, Inc. ("TAG") is an independent contractor which inspects cargo on behalf of carriers to ensure tariff compliance. TAG obtains information from the carriers that customers furnish regarding their cargo. TAG may open and examine the contents of shipments to verify the accuracy of that information. If TAG determines that the cargo has been misdeclared by the customer, TAG will rebill the customer the difference, if any, between the freight charges for the actual type, origin and quantity of the commodity shipped, and the freight charges for the type, origin and quantity declared by the customer. TAG may also bill the customer a misdeclaration charge provided by the tariff. If the customer owes any charges, TAG will impound the shipment until the charges are paid. When cargo containers are detained by the customer beyond the free time authorized by Sea–Land's tariff, TAG will bill and collect the detention charges according to the tariff.

On January 20, 1999, Sea–Land filed the instant Motion to Dismiss and/or for Summary Judgment on Fleming's Counterclaim. Because matters outside the pleadings were relied upon and cited to the court, pursuant to Federal Rule of Civil Procedure 12(b), Sea–Land's motion will be treated as one for summary judgment.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1050 (9th Cir.1995). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the

truth. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The substantive law defines which facts are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact requires more than some "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over outcome determinative facts under the applicable substantive law will preclude the entry of summary judgment. *Id.* If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th Cir.), *cert. denied*, 519 U.S. 868, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir.1996).

The Supreme Court cases cited above establish that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 1).

## DISCUSSION

Fleming's counterclaim alleges that:

1. Sea–Land engaged in an illegal tying arrangement in violation of the Sherman Act, 15 U.S.C. § 1;

2. Sea–Land contracted, conspired and combined with others for the purpose of restraining competition in the marketplace for shipping container-related services, in violation of the Sherman Act, 15 U.S.C. § 1;

3. Sea–Land engaged in unfair competition, in violation of Hawaii Revised Statute ("H.R.S.") § 480–2; and

4. Sea–Land violated H.R.S. § 480–4.

Sea–Land argues that each of Fleming's allegations either fails to state a claim upon which relief may be granted or fails to raise a genuine issue of material fact. The court addresses each in turn.

### I. *Federal Antitrust Claims*

■ Because API's and Fleming's counterclaims alleging antitrust violations are duplicative, Sea–Land argues that the "direct purchaser" rule precludes Fleming, as an indirect purchaser, from pursuing these claims. The undisputed facts show that during the relevant period of time, API purchased transportation services from Sea–Land and resold them to Fleming.[1] Fleming has not alleged that it purchased transportation directly from Sea–Land after 1994.

The United States Supreme Court described the "direct purchaser" doctrine:

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), ... [t]he State of Illinois sued Illinois Brick and other concrete block manufacturers for conspiring to raise

---

1. Any claims by Fleming arising before API took over its transportation functions in 1994 are barred by the 4–year statute of limitations applicable to antitrust claims. *See* 15 U.S.C. § 15b.

the cost of concrete blocks in violation of § 1 of the Sherman Act, as amended, 15 U.S.C. § 1. We ruled that the State had suffered no injury within the meaning of § 4 [of the Clayton Act] because Illinois Brick had not sold any concrete blocks to it.... We decided that ... it would risk multiple liability to allow suits by indirect purchasers. *See* 431 U.S. at 730–31, 97 S.Ct. 2061.

*Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). In *Kansas,* the Supreme Court reaffirmed its commitment to the rule, holding that when natural gas suppliers and power companies violate antitrust laws by overcharging a public utility for natural gas and the utility passes on the overcharge to its customers, only the utility has an antitrust cause of action, as it alone suffered an antitrust injury. *Id.*

The Supreme Court explained the rationale behind the rule: "The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers." *Kansas,* 497 U.S. at 208, 110 S.Ct. 2807. It also "serves to eliminate multiple recoveries." *Id.* at 212, 110 S.Ct. 2807. Finally, the rule provides the direct purchasers, those in the best position to observe an alleged violator's conduct, with incentives to bring private antitrust actions and thus promotes the vigorous enforcement of the antitrust laws. *Id.* at 214–15, 110 S.Ct. 2807 (citations omitted).

The rule applies with equal force to suits alleging an illegal tying arrangement. For example, in *Summerwood Corp. v. Cado Systems Corp.,* 1986 WL 308 (E.D.Pa. 1986), Summerwood sued under § 4 of the Clayton Act for damages resulting from the alleged antitrust violations of defendants. Summerwood alleged that the defendants violated the Sherman and Clayton Acts by tying together the sale of computer hardware and software. The court applied the reasoning of *Illinois Brick* and granted the defendant suppliers' motion to dismiss Summerwood's antitrust claims with prejudice:

> Summerwood's allegations that [the supplier] adjusted its software program so that it could only function with CADO hardware and that [the supplier] required the two be sold together suggest that [the distributor] may have suffered some anticompetitive injury of its own. A distributor forced to pay inflated prices for the tied good and prevented from selling products separately to meet consumer demands clearly has standing to sue the supplier who illegally shielded the tied product from the market forces.... Allowing Summerwood to sue [the supplier] for the same violation for which it is vulnerable to suit by [the distributor] would clearly expose [the supplier] to duplicate liability.

*Summerwood,* 1986 WL 308, *2. The *Summerwood* court recognized that in the tying context, a court is also faced with the difficulty of apportioning damages:

> Determining what part of the inflated price [the distributor] absorbed and what part was passed on to each indirect purchaser of the tied good would involve economic calculations so elusive that they would amount to little more than guesswork.... It would be no more appropriate to entangle a factfinder in these elusive calculations in the context of an alleged tying scheme than the [United States Supreme] Court found it in the context of price-fixing.

*Summerwood,* 1986 WL 308, * 2 (citing *Illinois Brick,* 431 U.S. at 742, 97 S.Ct. 2061).

Moreover, the Supreme Court has declined to carve out any exceptions to the rule: "The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Kansas,* 497 U.S. at 216, 110 S.Ct. 2807.

> The process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should

be drawn in a particular class of cases would inject the same massive evidence and complicated theories into treble-damages proceedings, albeit at a somewhat higher level of generality.

*Kansas,* 497 U.S. at 216–17, 110 S.Ct. 2807 (citing *Illinois Brick,* 431 U.S. at 744–45, 97 S.Ct. 2061). Thus, because the court concludes that the *Illinois Brick* "direct purchaser" rule applies, Fleming cannot maintain its federal antitrust claims.

## II. *State Statutory Claims*

### a. *H.R.S. § 480–2*

■ Section 480–2 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the practice of any trade or commerce." Only "consumers" may maintain a private action under this section. H.R.S. § 480–2(d). A "consumer" is defined as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." H.R.S. 480–1. Because Fleming does not meet the definition of a consumer, it lacks standing to sue for deceptive practices under H.R.S. § 480–2.

### b. *H.R.S. § 480–4*

Section 480–4(a) provides as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal.

In this sense, § 480–4(a) mirrors § 1 of the Sherman Act, which likewise prohibits joint action that impairs competition.

■ The United States Supreme Court held, in *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), that the "direct purchaser" doctrine does not preempt state antitrust statutes that expressly allow suit by indirect purchasers. H.R.S. § 480–3 provides:

This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except

that lawsuits by indirect purchasers may be brought as provided in this chapter. H.R.S. § 480–3. Therefore, even though Fleming is an indirect purchaser, it has standing to bring antitrust claims under § 480–4.

Within the purview of § 480–4, Fleming asserts two claims against Sea–Land: (1) that it engaged in an illegal tying arrangement; and (2) that it works in concert with Matson to impair competition.

### 1. *Tying Claim*

■ Pursuant to H.R.S. § 480–3, § 480–4 is to be construed in accordance with Section 1 of the Sherman Act. H.R.S. § 480–3. Section 1 declares illegal "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Tying arrangements have long been considered per se unlawful under Section 1. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). To establish a tying arrangement that is illegal per se, the plaintiff must show (1) the tying of two products; (2) that defendant had sufficient economic power in the tying product market to affect the tied product market, and (3) an effect on a substantial volume of commerce in the tied product market. *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1411 (9th Cir.1991). A tying arrangement exists when a seller refuses to sell one product (the tying product) unless the purchaser agrees to purchase another product (the tied product). *Northern Pacific,* 356 U.S. at 5, 78 S.Ct. 514; *Bhan,* 929 F.2d at 1411.

In this case, Fleming alleges that Sea–Land tied the purchase of its shipping services (the tying product) to the purchase of the use of Sea–Land's containers (the tied product). Fleming contends that it only wanted to purchase Sea–Land's shipping services. Because, however, Sea–Land's shipping rates include the cost of the containers, Fleming maintains that it was also forced to purchase the use of Sea–Land's containers. Although the rec-

ord clearly demonstrates that Rule 884 of Tariff 486 did not require API or any other shipper to *use* Sea–Land's containers, Sea–Land charged the same rate to API regardless of whether the customer used Sea–Land's or its own containers. Fleming alleges that API then passed along to it the cost of using Sea–Land's containers.

### (a). *Separate Tied Product*

■ To prevail on a tying claim, a plaintiff must first show that the scheme involves two separate products. *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18–25, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Sea–Land argues that the use of containers is a functional part of the ocean transportation of goods, rather than a separate product. In developing an approach to determine if two products are separate for tying purposes, the United States Supreme Court rejected a test based upon the functional relationship between the products. *Jefferson Parish*, 466 U.S. at 21, 104 S.Ct. 1551 ("We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."). In *Jefferson Parish*, the Supreme Court concluded that products are separate if "two distinguishable product markets [are] involved." *Id.* Subsequently, the Court refined this approach in *Eastman Kodak Company v. Image Technical Services, Inc.*: "[T]o be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one product] separately from [the other]." *Kodak*, 504 U.S. at 462, 112 S.Ct. 2072.

Thus, under *Jefferson Parish* and *Kodak*, Fleming must show that there is "sufficient consumer demand" in the Hawaii-Mainland ocean transportation market to make it efficient for carriers to offer a lease of containers as a service separate from the carriage. Fleming relies on the evidence adduced by API. This evidence

shows that at least two of Sea–Land's Hawaii–Mainland customers regularly use their own containers, and that other shippers may do so sporadically. Evidence also demonstrates that containers are interchangeable with other forms of transportation, including motor and rail transport, and that they can be used solely as a means to store goods. In addition, API clearly demanded separate services, as demonstrated by its attempts to negotiate with Sea–Land for reduced rates that would reflect the cost of shipping without the cost of using Sea–Land's containers. Simply because Sea–Land refused to sever the cost of the services does not mean that demand for separate services did not exist. As further "evidence" of lack of demand, Sea–Land points to the fact that even shippers who use their own containers pay the same rate as customers who elect to use containers provided by Sea–Land. Rather than establish an absence of consumer demand, this fact merely bolsters Fleming's claim that shippers who choose to use their own containers are still forced to pay for services that they do not want or need.

The court concludes that a genuine issue of material fact exists as to whether there is "sufficient consumer demand" for separate transportation and container services. Enough doubt is cast on Sea–Land's claim of a unified market that it should be resolved by the trier of fact. Before denying Sea–Land's Motion for Summary Judgment, however, the court must examine the other elements of a tying claim.

### (b). *Sale of the Tied Product/Coercion*

■ Before concluding that a link between two products constitutes a tying arrangement, a plaintiff must show that the buyer is required to purchase or lease the unwanted product. *Kellam Energy, Inc. v. Duncan*, 668 F.Supp. 861, 881 (D.Del. 1987). Sea–Land argues that because it does not assess a separate charge for the use of its containers, neither API nor Fleming was forced to purchase anything. Sea–Land characterizes the use of its con-

tainers as a free service provided to its customers. Other courts, however, have rejected similar contentions, holding that to do otherwise would permit escape from antitrust laws prohibiting illegal tie-ins, by the simple device of offering both products as a unit at a single price, while claiming that one of the two is a "free giveaway." *See, e.g., Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2nd Cir.1976). This court agrees. Thus, Sea–Land's inclusion of the cost of containers in its shipping rates belies its claim that there was no sale of container services.

Moreover, Sea–Land's pricing scheme may also establish the requirement of "coercion." "When a buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific Ry.*, 356 U.S. at 5–6, 78 S.Ct. 514. In this case, however, Sea–Land does not offer the products separately. Because Sea–Land charges one price, which includes both products, there is evidence customers may be coerced through their purchase of the first product to also purchase the second unwanted product.

#### (c). *Market Power*

Tying arrangements are per se illegal where the seller has market power. *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. 1551. "Market power is the ability 'to force a purchaser to do something that he would not do in a competitive market.'" *Kodak*, 504 U.S. at 464, 112 S.Ct. 2072 (quoting *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. 1551). Market definition is the first step in the assessment of market power. *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3rd Cir.), *cert. denied*, 506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992) (relevant market was all automobiles, not just Chrysler automobiles). Both Sea–Land and Fleming apparently agree that the relevant market in this case is Hawaii–Mainland ocean carriage of goods in containers.

The Supreme Court has identified three sources of market power. First, when the government has granted the seller "a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power." *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. 1551 (citing *United States v. Loew's, Inc.*, 371 U.S. 38, 45–47, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962)). The second is when "the seller's share of the market is high." *Id.* (citing *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611–13, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)). The third is when "the seller offers a unique product that competitors are not able to offer." *Id.*

Sea–Land contends that its share of this market is 33%, while Matson controls the other 66%. Sea–Land argues that its 33% market share is insufficient, as a matter of law, to constitute "market power." In *Jefferson Parish*, the Supreme Court held that a 30% market share did not give rise to the inference of market power necessary for application of the per se rule against tying. *Id.* at 27, 104 S.Ct. 1551. Lower courts have subsequently used the 30% market share as a minimum threshold for showing market power. *See Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660 (6th Cir.1993) (11% market share cannot confer market power); *A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673 (6th Cir.1986) (2–4% insufficient); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir.1985) ("pygmy among large, national firms" had no market power), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); *M. Leff Radio Parts, Inc. v. Mattel Inc.*, 706 F.Supp. 387 (W.D.Pa.1988) (30% market share of home video games sufficient to demonstrate market power).

In this case, Fleming disputes Sea–Land's calculation of its market share. Evidence proffered by API shows that Sea–Land operates seven vessels in the Hawaii–Guam market and that, as of January 1999, Matson had reduced its Hawaii–

Mainland fleet to six ships. The record is unclear as to whether the number of Sea–Land ships in the Hawaii–Guam market is the same as those in the Hawaii–Mainland market. The court need not pursue this mystery further, however, as the evidence relied upon by API is inadmissible pursuant to Federal Rule of Civil Procedure 56(e). The information regarding Matson was apparently taken from Matson's website. Although incorporated into API's counsel's affidavit, counsel does not purport to have any personal knowledge of the underlying facts. Moreover, this evidence would be inadmissible as hearsay.

Nevertheless, the court finds that Sea–Land's now undisputed 33% market share, coupled with the unique factors that 1) the market consists of only two participants, and 2) the Jones Act may prevent entry of new competitors into the market, renders the existence of Sea–Land's market power a question of material fact for the jury.

#### (d). *Economic Interest*

■ Sea–Land argues that no tying arrangement exists because it does not have an economic interest in the tied product market, that is, the container market. Relying on *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Systems, Inc.,* 491 F.Supp. 1199, 1209 (D.Haw.1980), *aff'd,* 732 F.2d 1403 (9th Cir.1984), Sea–Land maintains that Fleming must show that Sea–Land "participates for profit" in the tied product market. Sea–Land's reliance on *Robert's* is misplaced. The *Robert's* decision made it clear that the defendant's economic interest is sufficient where, as here, the seller of the tying product is also the seller of the tied product. Only when the tied product is sold by a separate company must the seller of the tying product have an economic interest in the sale of the tied product. *Robert's,* 732 F.2d at 1407–08. Thus, Fleming need not demonstrate that Sea–Land has an economic interest in the container market.

#### (e). *Effect on Commerce*

The final requirement in a per se tying violation is that a "not insubstantial"

amount of commerce in the tied product market must be affected by the tie. "The 'not insubstantial' requirement can be satisfied by the foreclosure of a single purchaser, so long as the purchaser represents a 'not insubstantial' dollar-volume of sales." *Datagate, Inc. v. Hewlett Packard Co.,* 60 F.3d 1421 (9th Cir.1995). In this case, API has established that approximately $3.4 million dollars worth of containers were not purchased as a result of Sea–Land's tying arrangement. Clearly, this arrangement has more than an insubstantial effect on commerce.

Because the court concludes that genuine issues of material fact exist with respect to 1) whether there is "sufficient consumer demand" in the market for separate transportation and container services, and 2) whether Sea–Land has "market power," Sea–Land's Motion for Summary Judgment on the tying claim is DENIED.

#### 2. *Concerted Action*

■ Fleming alleges that Sea–Land works in concert with Matson to impair competition. Because a conspiracy cannot usually be established by direct evidence, *Souza v. Estate of Bernice Pauahi Bishop,* 821 F.2d 1332, 1334–35 (9th Cir.1987), antitrust plaintiffs "may rely upon circumstantial evidence from which a violation may be inferred." *Id.* at 1335. For example, a plaintiff may satisfy the concerted action requirement by demonstrating that the conspirators acted in the same fashion and that their conduct was against their own self-interest, *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 884 (9th Cir.1982), or that a high-level of interfirm communication existed in conjunction with the parallel actions. *See, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1242 (3rd Cir.1993).

Fleming concedes that it has no "smoking gun" evidence of a conspiracy between Sea–Land and Matson. Nevertheless, it contends that Sea–Land's conduct in "charging all customers for use of containers they don't want" is against its self-

interest and can only be explained by an agreement with Matson. Fleming, however, offers no evidence to support such a theory. Thus, its mere assertion that "[t]he chances that Sea–Land and Matson have acted separately ... are unlikely[,]" fails to raise a genuine issue of material fact where Fleming has not demonstrated that Sea–Land's conduct is against its self-interest.

Fleming next argues that Sea–Land is "so closely tied to Matson that it is impossible to imagine that they could act on their pricing policies without each others' concurrence." Although Fleming identifies two documents as support, neither establishes that Sea–Land and Matson communicated in regards to their parallel actions.

First, Fleming relies on a Space Sharing Agreement between the two carriers. The Space Sharing Agreement merely provides for emergency shipping of cargo on each other's vessels "in the event of a vessel casualty or severe operational problems unrelated to vessel casualty." This Agreement does not implicate antitrust concerns as it does not affect either the freight rate billed to the customer by the original carrier or either carrier's container policy.[2]

Second, Fleming points to the State of Hawaii's Comments in Response to the U.S. Department of Transportation's Request for Public Comment on Competition in the Noncontiguous Domestic Offshore Trades (the "State Comment"). The State Comment is a brief filed by certain State agencies, unsuccessfully advocating a return to a close regulation of the carriers' rates or at least a repeal of the "zone of reasonableness" provision in the ICC Termination Act, 49 U.S.C. § 13701(d), which established a presumption of validity of the carriers' rates so long as the upward annual increase of the rates did not exceed 7.5%. In that brief, the State agencies

opine and argue that there is a concerted action instead of competition between Sea–Land and Matson. Importantly, the State agencies' opinions regarding the alleged concerted action were not the result of any judicial or quasi-judicial administrative fact finding. Because Fleming does not purport to have personal knowledge regarding the contents of the brief, it cannot be considered as evidence upon this motion. Fed.R.Civ.P. 56(e); *Kim v. United States,* 121 F.3d 1269, 1276–77 (9th Cir.1997); *Keenan v. Allan,* 91 F.3d 1275, 1278 (9th Cir.1996); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995).

Because the court concludes that Fleming has not raised a genuine issue of material fact as to whether Sea–Land has engaged in concerted action with Matson, Sea–Land is entitled to summary judgment on this claim.

Of the claims presented in Fleming's counterclaim, only the tying claim under H.R.S. § 480–4 survives summary judgment. Thus, the court briefly considers the issue of federal jurisdiction. Fleming's counterclaim was properly brought before the federal court, either on the basis that 1) it was a compulsory counterclaim within the court's jurisdiction over the original claim, or 2) that it was a permissive counterclaim that presented a federal question under 28 U.S.C. § 1331. If Fleming's counterclaim is compulsory, the court has federal jurisdiction because it has jurisdiction over the original claim. However, even if the counterclaim is permissive, the court, in its discretion, may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Section 1367 provides that a district court may decline to exercise supplemental

---

**2.** In fact, the Agreement is pro-competitive because it enables either carrier to compete with the other notwithstanding unexpected operational problems. For example, if a Sea–Land vessel were disabled, a prospective shipper would still have the option of shipping

under Sea–Land's tariff and its Bill of Lading, although the cargo would actually be carried on board Matson's vessel. Without the Agreement, the shipper could only ship under Matson's terms.

jurisdiction over a state claim if the district court has dismissed all claims over which it has original jurisdiction. In this case, the court concludes that Fleming lacks standing to pursue the federal antitrust claims. Nevertheless, because the court must proceed with API's identical tying claim, considerations of judicial economy and convenience of the parties and witnesses persuade the court to retain jurisdiction. Thus, Fleming may proceed before this court on the tying claim.

## CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Sea–Land Service, Inc.'s Motion to Dismiss and/or for Summary Judgment on Fleming Companies, Inc.'s Counterclaim. Fleming lacks standing to bring its federal antitrust claims because it is not a "direct purchaser" of Sea–Land's services. Fleming also lacks standing to pursue its H.R.S. § 480–2 claim, as it does not meet Hawaii's definition of a "consumer." Finally, although Fleming has presented no genuine issue of material fact with respect to its H.R.S. § 480–4 claim for concerted action, Fleming does present a viable claim under § 480–4 for an illegal tying arrangement. Therefore, Sea–Land is entitled to summary judgment on all claims presented in Fleming's Counterclaim except the tying claim.

IT IS SO ORDERED.